IN THE CIRCUIT COURT OF LINCOLN COUNTY, MISSOURI
CIRCUIT JUDGE DIVISION

2008 MAR -5 PM 4: 16

CIRCUIT COURT CLERK
LINCOLN COUNTY, MO.

| | |
|---|---|
| MICHELLE PRATT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. |
| | ) |
| THE COLLIER ORGANIZATION, INC., | ) |
| Serve: Registered Agent | ) |
| Donald G. Collier, Jr., | ) |
| 135 Triad West Drive | ) |
| O'Fallon, Missouri    63366 | ) |
| | ) |
| Defendant, | ) |
| and | ) |
| | ) |
| TRIAD DEVELOPMENT COMPANY | ) |
| Serve: Registered Agent | ) |
| Donald G. Collier, Jr., | ) |
| 135 Triad West Drive | ) |
| O'Fallon, Missouri    63366 | ) |
| | ) |
| Defendant, | ) |
| and | ) |
| | ) |
| TRIAD DEVELOPMENT | ) |
| Serve: Registered Agent | ) |
| Donald G. Collier, Jr., | ) |
| 135 Triad West Drive | ) |
| O'Fallon, Missouri    63366 | ) |
| | ) |
| Defendant. | ) |

## PETITION
### Facts Common To All Counts

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for her facts

common to all counts of her Petition states to the Court as follows:

1.    At all times relevant herein Plaintiff, MICHELLE PRATT, was a resident of the

1



EXHIBIT
B

Autumn Hills Mobile Home Park located Lincoln County, State of Missouri, hereinafter referred to as (the "**Park**");

2.      Upon information and belief the Defendant, THE COLLIER ORGANIZATION, INC., is a corporation duly organized and existing under the laws of the State of Missouri and is an owner of the Park;

3.      Upon information and belief the Defendant, TRIAD DEVELOPMENT COMPANY, is a fictitious name registration existing under the laws of the State of Missouri and is a developer of the Park;

4.      Upon information and belief the Defendant, TRIAD DEVELOPMENT, is a fictitious name registration existing under the laws of the State of Missouri and is a developer of the Park;

5.      On or about December 1, 2002, Plaintiff executed a lease agreement with the Defendants, THE COLLIER ORGANIZATION, INC., for her tenancy in the Park, herein referred to as (the "**Lease**"). A copy of said Lease is attached hereto and incorporated by reference as Plaintiff's Exhibit "1";

6.      Under the terms of the Lease, Defendants contracted with the Plaintiff as her landlord who agreed to provide a mobile home lot site, water services and sewer services;

7.      Under the terms of the Lease, Plaintiff paid a security deposit to the Defendant in the amount of Three Hundred Dollars ($300.00);

8.      Under the terms of the Lease, Plaintiff was obligated to pay the following amounts to the Defendant:

   a.      One Hundred Sixty Dollars ($160.00) per month for a 32x80 mobile pad site;

   b.      Twenty Dollars ($20.00) per month for water;

c.    Twenty Dollars ($20.00) per month for sewer;

9.    Upon execution of the Lease and payment of monies, the Plaintiff moved her mobile home into the Park;

10.    At the time of executing the Lease, Defendants represented to the Plaintiff that the Park would include a "family picnic area, basketball court, softball diamond, volleyball court, soccer field, nature paths for walks, jogging or biking, on-site management, maintenance, proposed on-site children's daycare center and lighted streets";

11.    Defendants have failed to develop the above-mentioned amenities;

12.    At the time of executing the Lease, Plaintiff had no knowledge, actual or constructive, with regard to any latent or patent defects with the Park;

13.    Defendants began development of the Park in 1997 with the intent of creating a mobile home park community;

14.    Defendants development plan called for the construction of two (2) wells to be located within the Park , hereinafter referred to as ("**Well No. 1**" and "**Well No. 2**");

15.    Well No. 1 and Well No. 2 constituted the community water system source for the supply of drinking water to the Park's tenants;

16.    On November 7, 1997, the State of Missouri, Department of Natural Resources, Division of Geology and Land Survey responded to the Defendants' inquiries into the construction of Well No. 1 and Well No. 2;

17.    On November 7, 1997, Division of Geology and Land Survey advised the Defendants that the proposed wells must conform the Department of Natural Resources, Division of Environmental Quality specifications as found in 10 C.S.R. 60-010 *et seq.*, the Missouri Safe

3

Drinking Water Act and the Missouri Public Drinking Water Regulations;

18. On November 7, 1997, Division of Geology and Land Survey advised the Defendants that water quality may deteriorate with a well depth below the St. Peter Sandstone aquifer in the area;

19. On or about December 27, 1997, Defendants submitted to the Missouri Department of Natural Resources two (2) copies of their improvement plans for the Park and an Engineering Report and Specifications for review of the proposed water system's dispense permit;

20. Defendants' Engineering Report and Specifications warned the Defendants that water levels below 1500 feet, at the Park's proposed site, would require drilling into the Roubidoux Formation aquifer which was "known to have high levels of Raduim 226, 228 and Gross Alpha";

21. On February 24, 1998, the Defendants received the Missouri Department of Natural Resources Public Drinking Water's, hereinafter (the "**DNR**"), approval of its Application For A Construction Permit with regard to the drilling and construction of Well No. 1 and Well No. 2;

22. In September 1998, after construction and drilling of Well No. 1 and Well No. 2 was completed, the Defendants received water quality test reports from St. Louis Test Laboratories indicating that the water dispensing from Well No. 1 contained a radioactive Gross Alpha level of 28.8±3.5 picoCuries per Liter (pCi/L) and that water dispensing from Well No. 2 contained a radioactive Gross Alpha level of 13.4±2.5 (pCi/L);

23. In September 1998, St. Louis Test Laboratories reported to the Defendants that the water in Well No. 1 contained a radioactive Gross Beta level of 18.5±.9 (pCi/L) and that the water in Well No. 2 contained a radioactive Gross Beta level of 15.9±.9 (pCi/L);

24. On January 1, 1999, DNR conducted its final approval inspection of the Park's public drinking water system;

4

25. On January 1, 1999, DNR reported to the Defendants the following:

    a. Well No. 1 had been coliform bacteria positive on several tests and had required shock chlorination several times;

    b. Well No. 1 revealed that the secondary standard for Total Dissolved Solids (TDS) had exceeded acceptable levels;

    c. Inorganic testing of Well No. 1 revealed that the secondary standard of 2.0 mg/l for fluoride had exceeded acceptable levels;

    d. Well No. 1 had analysis results of 24.5 pCi/L, which exceeded the Maximum Contaminant Level (MCL), and would require treatment;

    e. Iron levels in Well No. 2 exceeded the secondary standard level;

    f. Well No. 2 had analysis results of 13.4 pCi/L which exceeded the Maximum Contaminant Level and would require treatment;

26. On January 1, 1999, DNR recommended to the Defendants that the Defendants install of an "ion-exchange softening" technology to remove the Radionuclides contained in the Park's public water-supply wells;

27. On February 15, 1999, DNR notified the Defendants that they must provide a sample of its public drinking water by November 1999 for Radionuclide testing;

28. On March 11, 1999, DNR recommended a "Temporary Permit to Dispense" until the Defendants provided additional sampling and showed that the Defendants' public water-supply wells had satisfactory water quality, or until satisfactory treatment had been installed;

29. On March 29, 1999, DNR sent Notice of Noncompliance to the Defendants with regard to two (2) positive coliform bacteria tests results from the Park's public water-supply wells;

30.    On March 29, 1999, pursuant to the Notice of Noncompliance, DNR required the Defendants to provide written notification to all water system customers of the coliform bacteria violations and return to DNR a completed certification form indicating that the Defendants complied with the DNR notification requirements;

31.    Upon information and belief, the Defendants failed to notify the Park's public water-supply customers and failed to certify to DNR its compliance with the required notification action;

32.    On June 16, 1999, DNR sent Notice of Noncompliance to the Defendants with regard to two (2) positive coliform tests results from the Park's public water-supply wells;

33.    On June 16, 1999 DNR, pursuant to the Notice of Noncompliance, required the Defendants to provide to written notification to all water system customers of the coliform bacteria violations and return to DNR a completed certification form indicating that the Defendants complied with the DNR notification requirements;

34.    Upon information and belief, the Defendants failed to notify the Park's public water-supply customers and failed to certify to DNR its compliance with the required notification action;

35.    On January 29, 2002, DNR sent correspondence to the Defendants with regard to the proposed Missouri Radionuclides Rule, said correspondence advised the Defendants of the following:

      a.    The Missouri Radionuclides Rule would adopt the U.S. Environmental Protection Agency standards with regard to Radionuclide levels in public water systems;

      b.    The Missouri Radionuclides Rule would require the Defendants to monitor each entry point to the distribution system, rather than at a representative

point in the system;

c.   The Missouri Radionuclides Rule required that systems with existing monitoring data showing levels above acceptable Maximum Contaminant Levels to be deemed in noncompliance beginning on December 8, 2003;

d.   DNR notified the Defendants that based on the Defendants' historical monitoring records, their system may be deemed in noncompliance on December 8, 2003;

e.   DNR notified the Defendants that a quarterly monitoring of the Park's public water-supply wells' entry points would need to begin;

f.   DNR notified the Defendants that if the Defendants' Park's public water-supply well system remained in noncompliance then a compliance schedule would be required;

36.   On July 3, 2002, DNR notified the Defendants that water samples collected from Well No. 1 and Well No. 2 indicated that the Park's public water-supply wells exceeded the Maximum Contaminant Level for Gross Alpha Particle activity, Radium 226 and combined Radium 226 & Radium 228;

37.   On July 3, 2002, DNR recommended that the Defendants install an ion-exchange softening treatment system for the Park's public water-supply wells to correct the excessive levels Gross Alpha Particle activity, Radium 226 and combined Radium 226 & Radium 228;

38.   Upon information and belief, Defendants did not and have never installed an ion-exchange softening treatment system for the Park's public water-supply wells to correct the excessive levels Gross Alpha Particle activity, Radium 226 and combined Radium 226 & Radium

228;

39. On or about October 31, 2003, the Department of Natural Resources promulgated regulations, hereinafter referred to (the "**Radionuclide Rule**"), that set the acceptable Maximum Contaminant Levels of public water-supply systems, like that at the Park, for Gross Alpha Emitters at 15 (pCi/L);

40. On or about October 31, 2003, the Department of Natural Resources promulgated regulations, hereinafter referred to (the "**Radionuclide Rule**"), that set the acceptable Maximum Contaminant Levels of public water-supply systems, like that at the Park, for combined Radium 226 and 228 at 5 (pCi/L);

41. On June 9, 2004, DNR issued a Notice of Violation to the Defendants with regard to the Defendants' non-compliance with the Radionuclide Rule (10 C.S.R. 60-4.060);

42. On June 9, 2004, pursuant to the Notice of Noncompliance, DNR required the Defendants to provide written notification of the Radionuclide Rule violations to all of the Park's public water-supply customers and return to DNR a completed certification form indicating that the Defendants complied with the DNR notification requirements;

43. Upon information and belief, the Defendants failed to notify the Park's public water-supply customers, including the Plaintiff, and failed to certify to the DNR its compliance with the required notification action;

44. Pursuant to the Missouri Safe Drinking Water Act and the Missouri Public Drinking Water Regulations, DNR required the Defendants to provide quarterly written notification to all of the Park's public water-supply customers with regard to the excessive radionuclides contained in Well No. 1 and Well No. 2;

8

45.    On November 10, 2005, DNR notified the Defendants that it was a Significant Non-Complier with regard the radionuclide requirements in violation of 10 C.S.R. 60-4.060;

46.    Defendants were a Significant Non-Complier because the radiological contaminants in the Park's drinking water samples exceeded the maximum contaminant level or for failing to submit such samples for analysis;

47.    On November 10, 2005, DNR demanded the Defendants to execute a Bilateral Compliance Agreement to address the radiological contaminants at the Park;

48.    The Bilateral Compliance Agreement was necessary because of the Defendants' failure to comply with 10 C.S.R. 60-4.060, because of the seriousness of the Defendants' violations and because of the "potential threats to human health" that the Defendants' violations posed to the Park's tenants;

49.    The Bilateral Compliance Agreement set a schedule under which the Defendants were to bring the Park's public water-supply system into conformity with Missouri State and Federal law;

50.    Defendants executed the Bilateral Compliance Agreement on October 10, 2006;

51.    Upon information and belief, Defendants have failed to comply with the Bilateral Compliance Agreement;

52.    On December 13, 2006, DNR sent to the Defendants a Notice of Violation For Failure to Perform Public Notice;

53.    On December 13, 2006, DNR notified the Defendants that it had not "received any documentation of public notice" for the Defendants violations occurring between July 2004 to December 13, 2006;

9

54.    The Park's public water-supply system's historical data indicates that it's radionuclide contamination levels exceeded the maximum amount allowable by Missouri State and Federal Law every year since 2003 to the present;

55.    Upon information and belief, the Park's public water-supply system exceeded the Maximum Contaminant Levels of Gross Alpha Emitters set at 15 (pCi/L) and exceeded the Maximum Contaminant Levels for combined Radium 226 and 228 set at 5 (pCi/L) since Well No. 1 and Well No. 2 came online in 1998; and,

56.    Defendants remain in violation of Department of Natural Resources, Division of Environmental Quality specifications as found in 10 C.S.R. 60-3, 10 C.S.R. 60-10 of the Missouri Safe Drinking Water Act and the Missouri Public Drinking Water Regulations.

## Class Allegations

57.    The named Plaintiff brings this action as a class action, on her own behalf and on behalf of all others similarly situated, pursuant to Rule 52.08 or the Missouri Rules of Civil Procedure and Mo. Rev. Stat. § 407.025;

58.    Plaintiff represents a class consisting of all persons who held leases with the Defendants at the Park or who resided at the Park, from 1998 to the present;

59.    Although the exact number of members of the class is unknown, it is estimated to exceed several hundred members, and the class is so numerous that joinder of individual members in this action is impracticable, but not so many members that administration of the class in unmanageable;

60.    There are many questions common to members of the class. Such common questions include, but are not limited to, whether the Defendants are liable to the Plaintiff and the class:

a.    For failing to notify the Plaintiff and the class of latent and patent defects in the Park;

b.    For knowingly concealing from the Plaintiff and the class the existence of latent and patent defects in the Park;

c.    For knowingly concealing information from the Plaintiff and the class of latent and patent defects in the Park that could adversely affect the life, health and safety of the Plaintiff and the class;

d.    For violating the Missouri Safe Drinking Water Act, Mo. Rev. Stat. § 640.100 *et seq.*;

e.    For violating the Missouri Code of State Regulations as promulgated by the Missouri Department of Natural Resources, 10 C.S.R. 60-1.010 *et seq*;

f.    For violating the Missouri Merchandising Practices Act Mo Rev. Stat. § 407.010 *et seq.*;

g.    For failing to repair or correct known latent and patent defects in the Park;

h.    For negligently breaching a duty owed to the Plaintiff and the class;

i.    For the Defendants' breach of contract;

j.    For failing to provide Notice of Violations to the Plaintiff and the class as required by the Department of Natural Resources;

k.    For inadequately hiring and training employees;

l.    For employing untrained or poorly trained employees;

m.    For medical monitoring of the class; and

n.    Defendants' liability for punitive damages.

11

## Count I - Fraud

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for Count I of her Petition states to the Court as follows:

61.     Plaintiff re-alleges the allegations contained in paragraphs No. 1 through 60 of her Petition and incorporates the same by reference as though fully set forth herein;

62.     Defendants' did conceal from and failed to notify the Plaintiff with regard to the public water system's contaminants and contaminant levels and said omissions and failures resulted in the Defendant making false and fraudulent misrepresentations;

63.     The Defendants had a special relationship of trust and confidence with the Plaintiff as the Park's owners, developers and landlords;

64.     Defendants' concealment of facts from the Plaintiff with regard to the public water system's contaminants and contaminant levels were material to the Plaintiffs' execution of the lease agreement and continuation of the Plaintiff's tenancy on the Property;

65.     Defendants' failure to develop the above-mentioned amenities were false and fraudulent misrepresentations which were material to the Plaintiffs' execution of the lease agreement and continuation of the Plaintiff's tenancy on the Property;

66.     At the time of concealing the above mentioned facts or making said fraudulent representations, Defendants either knew that the representations were false or made them without knowing whether they were true or false;

67.     Defendants intended that the Plaintiff would rely upon and act on the Defendants' concealment of material facts and fraudulent misrepresentations in the Plaintiff's execution of the lease agreement, in the Plaintiff's continual payment of monies to the Defendants, and for the

12

Plaintiff's tenancy in the Park;

68.    Plaintiff was unaware of the concealed material facts, of the omissions or that the Defendants' representations were false and Plaintiff relied upon the Defendants' concealment and representations as being true and had the right to so rely;

69.    As the direct, consequent and proximate result of Plaintiff's reliance, the Plaintiff has suffered injury and damages including, but not limited to, the payment of monies to the Defendants for rent, water and sewer services; the diminution in value of Plaintiff's property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages; and,

70.    Defendants' conduct as alleged above constituted outrageous conduct due to the Defendants' evil motives or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiff to recover punitive damages from the Defendants in order to deter the Defendants and others from like conduct in the future.

WHEREFORE, Plaintiff prays for judgment against the Defendants, both jointly and severally, for a fair and reasonable amount of actual and punitive damages in a sum in excess of Twenty Five Thousand Dollars ($25,000.00); for Plaintiff's costs incurred herein; and for such other and further relief as the Court deems just and proper in the premises.

### Count II - Violation of the Missouri Merchandising Practice Act

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for Count II of her Petition against the Defendants states to the Court as follows:

71.    Plaintiff re-alleges the allegations contained in paragraphs Nos. 1 through 70 of the Petition and incorporates the same by reference as though fully set forth herein;

72.    Plaintiff is a "consumer" pursuant to Mo. Rev. Stat. §§ 407.010 *et seq.* and is

member of the class meant to be protected;

73.     Defendants are "persons" as defined by Mo. Rev. Stat. § 407.010 *et seq.*;

74.     Plaintiff purchased and leased merchandise, goods and services from the Defendants and said merchandise, goods and services were meant to be used by the Plaintiff primarily for household purposes;

75.     The conduct alleged in paragraphs Nos. 1 through 60 above constituted unlawful merchandising practices which were made and done in violation of Mo. Rev. Stat. § 407.020;

76.     As the direct, consequent and proximate result of Plaintiff's reliance, the Plaintiff has suffered injury and damages including, but not limited to, the payment of monies to the Defendants for rent, water and sewer services; the diminution in value of Plaintiff's property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages;

77.     Defendants' conduct as alleged above constituted outrageous conduct due to the Defendants' evil motives or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiffs to recover punitive damages as provided by Mo. Rev. Stat. § 407.025 from the Defendants in order to deter the Defendants and others from like conduct in the future; and,

78.     Defendants are liable to Plaintiff for her reasonable attorney's fees incurred herein, as provided in Mo. Rev. Stat. § 407.025.

WHEREFORE, Plaintiff prays for judgment against the Defendants, both jointly and severally, for a fair and reasonable amount of actual and punitive damages in a sum in excess of Twenty Five Thousand Dollars ($25,000.00); for Plaintiff's reasonable attorney's fees and costs incurred herein; and for such other and further relief as the Court deems just and proper in the premises.

## Count III - Breach of the Implied Warranty of Habitability

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for Count III of her Petition against the Defendants states to the Court as follows:

79.    Plaintiff re-alleges the allegations contained in paragraphs Nos. 1 through 78 of the Petition and incorporates the same by reference as though fully set forth herein;

80.    The Defendants' actions or omissions, as alleged above, have affected the life, health, and safety of the Plaintiff, including but not limited to, the fact that the Plaintiff has lived in the Park where its public water-supply system violated contamination levels for coliform bacteria and violated the Maximum Contaminant Levels for Gross Alpha Particle activity, Radium 226 and combined Radium 226 & Radium 228;

81.    Defendants had actual notice of the problems existing in the Park and the need to correct the problems, but the Defendants failed, refused or omitted to correct the problems, failed to provided the required notices to the Plaintiff, and failed to abide by the Bilateral Compliance Agreement;

82.    As the direct, consequent and proximate result of Plaintiff's reliance, the Plaintiff has suffered injury and damages including, but not limited to, the payment of monies to the Defendants for rent, water and sewer services; the diminution in value of Plaintiff's property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages; and,

83.    Defendants' conduct as alleged above constituted outrageous conduct due to the Defendants' evil motives or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiffs to recover punitive damages from the Defendants in order to deter the Defendants and others from like conduct in the future.

15

WHEREFORE, Plaintiff prays for judgment against the Defendants, both jointly and severally, for a fair and reasonable amount of actual and punitive damages in a sum in excess of Twenty Five Thousand Dollars ($25,000.00); for Plaintiff's costs incurred herein; and for such other and further relief as the Court deems just and proper in the premises.

### Count IV - Negligence

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for Count IV of her Petition against the Defendants state to the Court as follows:

84.     Plaintiff re-alleges the allegations contained in paragraphs Nos. 1 through 83 of the Petition and incorporates the same by reference as though fully set forth herein;

85.     Defendants, as owners, developers and landlords of the Park, had a duty to provide information to the Plaintiff with regard to all latent and patent defects known to the Plaintiff in existence on the Park;

86.     Defendants, as owners, developers and landlords of the Park, had a duty to provide a safe living environment to the Plaintiff;

87.     Defendants breached that duty by failing, omitting or refusing to provide information to the Plaintiff with regard to the her tenancy in the Park, including but not limited to failing or omitting to provide information concerning the Park's public water-supply contamination levels for coliform bacteria and the Park's public water-supply violations of the Maximum Contaminant Levels for Gross Alpha Particle activity, Radium 226 and combined Radium 226 & Radium 228;

88.     Defendants breached their duty to the Plaintiff by failing, omitting or refusing to develop, construct or provide to the Plaintiff the promised amenities;

89.     As the direct, consequent and proximate result of Plaintiff's reliance, the Plaintiff has

suffered injury and damages including, but not limited to, the payment of monies to the Defendants for rent, water and sewer services; the diminution in value of Plaintiff's property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages; and,

90.     Defendants' conduct as alleged above constituted outrageous conduct due to the Defendants' evil motives or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiffs to recover punitive damages from the Defendants in order to deter the Defendants and others from like conduct in the future.

WHEREFORE, Plaintiff prays for judgment against the Defendants, both jointly and severally, for a fair and reasonable amount of actual and punitive damages in a sum in excess of Twenty Five Thousand Dollars ($25,000.00); for Plaintiff's costs incurred herein; and for such other and further relief as the Court deems just and proper in the premises.

### Count V - Negligence Per Se

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for Count V of her Petition against the Defendants states to the Court as follows:

91.     Plaintiff re-alleges the allegations contained in paragraphs Nos. 1 through 90 of the Petition and incorporates the same by reference as though fully set forth herein;

92.     Defendants were obligated to comply with all requirements of the Department of Natural Resources, Division of Environmental Quality specifications as found in 10 C.S.R. 60-1.010 *et seq.*, the Missouri Safe Drinking Water Act and the Missouri Public Drinking Water Regulations;

93.     Plaintiff is a member of the class meant to be protected by the Department of Natural Resources, Division of Environmental Quality specifications as found in 10 C.S.R. 60-1.010 *et seq.*, the Missouri Safe Drinking Water Act and the Missouri Public Drinking Water Regulations;

94. Defendants' omissions, failures, actions and fraudulent misrepresentations were a violation of the Department of Natural Resources, Division of Environmental Quality specifications as found 10 C.S.R. 60-1.010 *et seq.*, the Missouri Safe Drinking Water Act and the Missouri Public Drinking Water Regulations;

95. Defendants' violations of 10 C.S.R. 60-1.010 *et seq.*, the Missouri Safe Drinking Water Act and the Missouri Public Drinking Water Regulations are the types of violations that the regulations were designed to prevent;

96. As the direct, consequent and proximate result of Plaintiff's reliance, the Plaintiff has suffered injury and damages including, but not limited to, the payment of monies to the Defendants for rent, water and sewer services; the diminution in value of Plaintiff's property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages; and,

97. Defendants' conduct as alleged above constituted outrageous conduct due to the Defendants' evil motives or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiffs to recover punitive damages from the Defendants in order to deter the Defendants and others from like conduct in the future.

WHEREFORE, Plaintiff prays for judgment against the Defendants, both jointly and severally, for a fair and reasonable amount of actual and punitive damages in a sum in excess of Twenty Five Thousand Dollars ($25,000.00); for Plaintiff's costs incurred herein; and for such other and further relief as the Court deems just and proper in the premises.

### Count VI - Breach of Contract

COMES NOW Plaintiff, MICHELLE PRATT, by and through counsel, and for Count VI of her Petition against the Defendants states to the Court as follows:

98.    Plaintiff re-alleges the allegations contained in paragraphs Nos. 1 through 97 of the Petition and incorporates the same by reference as though fully set forth herein;

99.    Defendants breached the Lease by concealing material facts with regard to the Park's public water-supply system's contamination levels for coliform bacteria and the Park's public water-supply violations of the Maximum Contaminant Levels for Gross Alpha Particle activity, Radium 226 and combined Radium 226 & Radium 228;

100.    Defendants breached the Lease agreement by concealing material facts, by failing to disclose material facts, by failing to provide the promised amenities;

101.    Plaintiff has performed all of the obligations and conditions precedent under the terms of the Lease agreement; and,

102.    As the direct, consequent and proximate result of Plaintiff's reliance, the Plaintiff has suffered injury and damages including, but not limited to, the payment of monies to the Defendants for rent, water and sewer services; the diminution in value of Plaintiff's property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages.

WHEREFORE, Plaintiff prays for judgment against the Defendants, both jointly and severally, for a fair and reasonable amount of actual and consequential damages in a sum in excess of Twenty Five Thousand Dollars ($25,000.00); for Plaintiff's costs incurred herein; and for such other and further relief as the Court deems just and proper in the premises.

LAW OFFICE OF WILLIAM W. CHEESEMAN

By: _____

William W. Cheeseman  #35514
Noelle L. Cheeseman  #57695
Mark A. Kragel  #57552
1124 East Cherry Street
Post Office Box 343
Troy, Missouri  63379
Tel: (636) 528-5299
Fax: (636) 462-6201
Attorneys for Plaintiff


BREEZE, ROBERTS,
PONDER-BATES & ZIMMER, L.L.C.
Kevin.Roberts@BreezeLaw.com
Attorneys at Law
P.O. Box 888
Hillsboro, MO  63050
Tel:  (636) 797-2693
Fax: (636) 789-4205
Attorneys for Plaintiff

ENGELMEYER & PEZZANI, LLC
Tim@epfirm.com
Attorneys at Law
13321 North Outer Forty, #300
Chesterfield, MO  63017
Tel:  (636) 532-9933
Fax:  (314) 863-7793
Attorneys for Plaintiff