

# GRACE SINCLAIR
## CLERK OF THE CIRCUIT COURT
### LINCOLN COUNTY, MISSOURI

Sharon Eisenbath
Program Specialist
Probate Clerk

Connie Clary
Office Supervisor

State of Missouri )
          ) SS.
County of Lincoln )

IN RE: *13L6 - CC00131 Barbara Williams v Employers Mutual*

I, the undersigned Clerk of the Circuit Court, do hereby certify that the attached ___*52*___

pages are to be a true copy from the original file as requested by:

_*Brown & James*_____ as the same appears in my office.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal

of said court at office in Troy, this the *18th* day of *November* , 20 *13*

_*Grace Sinclair*_____ Circuit Clerk

By_*Dianne Dell*_D.C.

EXHIBIT
G

Lincoln County Justice Center • 45 Business Park Drive • Troy, Missouri 63379
636-528-6300 • Fax 636-528-9168



# IN THE 45TH JUDICIAL CIRCUIT COURT, LINCOLN COUNTY, MISSOURI

| Judge or Division:<br>CHRIS KUNZA MENNEMEYER | Case Number:  13L6-CC00131 | **RECEIVED** |
|---|---|---|
| Plaintiff/Petitioner:<br>BARBARA WILLIAMS | Plaintiff's/Petitioner's Attorney/Address<br>KELLEY FIELD FARRELL<br>16150 MAIN CIRCLE DRIVE<br>STE 120<br>ST LOUIS, MO 63017 | OCT 2 5 2013<br>FILED COUNTY<br>SHERIFF'S OFFICE |
| Defendant/Respondent:<br>EMPLOYERS MUTUAL CASUALTY<br>COMPANY, ETAL | Court Address:<br>LINCOLN CO. JUSTICE CENTER<br>45 Business Park Drive<br>TROY, MO 63379 | NOV 1 2 2013<br>Circuit Court<br>Lincoln County, MO |
| Nature of Suit:<br>CC Action Against Garnishee | | (Date File Stamp) |

vs.

## Summons in Civil Case

**The State of Missouri to:**  OWNERS INSURANCE COMPANY
**Alias:**

**C/O DIRECTOR OF INSURANCE**
**301 W HIGH STREET, ROOM 530**
**JEFFERSON CITY, MO  65101**

*COURT SEAL OF*

*LINCOLN COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

___10/22/13___     _____
Date                            Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).

☐ other _____ .

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____     _____
Printed Name of Sheriff or Server                 Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*     Subscribed and sworn to before me on _____ (date).

My commission expires: _____     _____
Date                          Notary Public

| **Sheriff's Fees** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $ 10.00 |
| Mileage | $_____  ( _____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**Cole County**
**Sheriffs**
**Department**
P.O. Box 426
Jefferson City, MO
65102
(573) 634-9160

# Return of Service



**FILED**

NOV 12 2013

Circuit Court
Lincoln County, MO

To: _Owners Insurance Company_

You will take notice that original process in the suit against you, a copy of which is attached hereto, was duly served upon you by serving the same on John Huff, Director, Department of Insurance, _K. Landers_

Designee, at 301 West High St., Jefferson City, Missouri 65101.

Dated at Cole County, Missouri, this _30th_ day of _October_, 2013 @ _0950_.

Greg White,
Sheriff of Cole County

Served by Deputy: _John P. Dunkins_



# IN THE 45TH JUDICIAL CIRCUIT COURT, LINCOLN COUNTY, MISSOURI

| Judge or Division:<br>CHRIS KUNZA MENNEMEYER | Case Number:  13L6-CC00131 | RECEIVED |
|---|---|---|
| Plaintiff's/Petitioner:<br>BARBARA WILLIAMS<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>KELLEY FIELD FARRELL<br>16150 MAIN CIRCLE DRIVE<br>STE 120<br>ST LOUIS, MO 63017 | OCT 25 2013<br><br>COLE COUNTY<br>SHERIFF'S OFFICE |
| Defendant/Respondent:<br> EMPLOYERS MUTUAL CASUALTY<br>COMPANY, ETAL | Court Address:<br>LINCOLN CO. JUSTICE CENTER<br>45 Business Park Drive<br>TROY, MO  63379 | |
| Nature of Suit:<br>CC Action Against Garnishee | | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to:  EMPLOYERS MUTUAL CASUALTY COMPANY<br>Alias: |
|---|

**C/O DIRECTOR OF INSURANCE**
**301 W HIGH STREET, ROOM 530**
**JEFFERSON CITY, MO  65101**

*COURT SEAL OF*

*LINCOLN COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

____10/22/13____    _____
Date                              Clerk

Further Information:

---

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.
I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____ (title).
☐ other _____.
Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server                     Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
Date                              Notary Public

---

**Sheriff's Fees**
| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**Cole County
Sheriffs
Department**
P.O. Box 426
Jefferson City, MO
65102
(573) 634-9160

# Return of Service

FILED

NOV 12 2013

Circuit Court
Lincoln County, MO



To: EMPLOYERS MUTUAL CASUALTY COMPANY

You will take notice that original process in the suit against you, a copy of which is attached hereto, was duly served upon you by serving the same on John Huff, Director, Department of Insurance, K. LANDERS

Designee, at 301 West High St., Jefferson City, Missouri 65101.

Dated at Cole County, Missouri, this 30th day of OCTOBER , 2013 @ 0950 .

Greg White,
Sheriff of Cole County

Served by Deputy: John P. Dinkins



## IN THE 45TH JUDICIAL CIRCUIT COURT, LINCOLN COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>CHRIS KUNZA MENNEMEYER | Case Number:  13L6-CC00131 |
| Plaintiff's/Petitioner:<br>BARBARA WILLIAMS | Plaintiff's/Petitioner's Attorney/Address<br>KELLEY FIELD FARRELL<br>16150 MAIN CIRCLE DRIVE<br>STE 120<br>ST LOUIS, MO  63017 |
| vs. | |
| Defendant/Respondent:<br> EMPLOYERS MUTUAL CASUALTY<br>COMPANY, ETAL | Court Address:<br>LINCOLN CO. JUSTICE CENTER<br>45 Business Park Drive<br>TROY, MO  63379 |
| Nature of Suit:<br>CC Action Against Garnishee | |

**RECEIVED**

OCT 2 5 2013

COLE COUNTY
SHERIFF'S OFFICE

(Date File Stamp)

### Summons in Civil Case

**The State of Missouri to:  CAPITOL INDEMNITY INSURANCE COMPANY**
**Alias:**

**C/O DIRECTOR OF INSURANCE**
**301 W HIGH STREET, ROOM 530**
**JEFFERSON CITY, MO  65101**

*COURT SEAL OF*

*LINCOLN COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

_____10/22/13_____      _____
          Date                                       Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____      _____
Printed Name of Sheriff or Server                Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____      _____
                                  Date                              Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $___10.00___ | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**Cole County
Sheriffs
Department**
P.O. Box 426
Jefferson City, MO
65102
(573) 634-9160

# Return of Service

## FILED

NOV 1 2 2013



To: CAPITOL INDEMNITY INSURANCE COMPANY

Circuit Court
Lincoln County, MO

You will take notice that original process in the suit against you, a copy of which is attached hereto, was duly served upon you by serving the same on John Huff, Director, Department of Insurance, K. LANDERS

Designee, at 301 West High St., Jefferson City, Missouri 65101.

Dated at Cole County, Missouri, this 30ᵗʰ day of OCTOBER, 2013 @ 0950.

Greg White,
Sheriff of Cole County

Served by Deputy: John P. Dinkins

**IN THE CIRCUIT COURT OF LINCOLN COUNTY, MISSOURI**
**CIRCUIT JUDGE DIVISION**

BARBARA WILLIAMS, Class Representative,     )
                                            )
              Plaintiff,                     )
                                            )
v.                                          )     Cause No.:
                                            )
                                            )     Division:
EMPLOYERS MUTUAL CASUALTY                   )
COMPANY,                                    )
                                            )
SERVE:                                      )
       Employers Mutual Casualty Company    )
       c/o Director of Insurance            )
       301 W. High Street, Room 530         )
       Jefferson City, MO  65101            )
                                            )
CAPITOL INDEMNITY INSURANCE                 )
COMPANY                                     )
                                            )
SERVE:                                      )
       Capitol Indemnity Insurance Company  )
       c/o Director of Insurance            )
       301 W. High Street, Room 530         )
       Jefferson City, MO  65101            )
                                            )
OWNERS INSURANCE COMPANY,                   )
                                            )
SERVE:                                      )
       Owners Insurance Company             )
       c/o Director of Insurance            )
       301 W. High Street, Room 530         )
       Jefferson City, MO  65101            )
                                            )
THE COLLIER ORGANIZATION, INC.,             )
                                            )
SERVE:                                      )
       The Collier Organization, Inc.       )
       c/o Donald G. Collier, Jr.           )
       Registered Agent                     )
       112 Fort Zummalt Square              )
       O'Fallon, MO  63366                  )
                                            )
              Defendants.                    )

*FILED*
OCT 18 2013
Circuit Court
Lincoln County, MO

13L6 - CC00131

1

<u>**PETITION FOR EQUITABLE GARNISHMENT**</u>

COMES NOW Barbara Williams, as class representative, by and through class counsel, and for her Petition for Equitable Garnishment, pursuant to Missouri Revised Statutes § 379.200, states as follows:

<u>**PARTIES, JURISDICTION AND VENUE**</u>

1.      Plaintiff Barbara Williams is the class representative of a class of residents who lived in the Autumn Hills Mobile Home Park located in Old Monroe, Lincoln County, State of Missouri from January 1, 1998 to January 1, 2009 who were exposed to elevated levels of alpha particle radiation from water pumped into their homes.  The class was certified by the Circuit Court of Lincoln County, Missouri, in an action captioned *Pratt v. The Collier Organization, Inc. et al.*, Cause No. 08L6-CC0004 ("the Underlying Lawsuit").

2.      At all relevant times mentioned herein, Defendant The Collier Organization, Inc. ("Collier") is a corporation organized and existing under the laws of the State of Missouri with its principal place of business located in O'Fallon, Missouri.

3.      At all relevant times mentioned herein, Defendant Employers Mutual Casualty Company ("EMC") is now and was a foreign insurance corporation with its principal offices located in the State of Iowa and is now and was authorized and approved to issue and, upon information and belief, did issue policies of insurance and collect premiums within Lincoln County in the State of Missouri, thereby insuring residents of Missouri, including Collier.

4.      At all relevant times mentioned herein, Defendant Capitol Indemnity Insurance Company ("Capitol Indemnity") was a foreign insurance corporation with its principal offices located in the State of Wisconsin and, upon information and belief, was authorized and approved

2

to issue and, upon information and belief, did issue policies of insurance and collect premiums within Lincoln County in the State of Missouri, thereby insuring residents of Missouri, including Collier.

5.     At all relevant times mentioned herein, Defendant Owners Insurance Company ("OIC") is now and was a foreign insurance corporation with its principal offices located in the State of Michigan and is now and was authorized and approved to issue and, did issue policies of insurance and collect premiums within Lincoln County in the State of Missouri, thereby insuring residents of Missouri, including Collier.

6.     This Court has personal jurisdiction over defendants pursuant to Section 506.500 of the Missouri Revised Statutes.

7.     The amount at issue is an amount in excess of the jurisdictional minimum of this Court.

**ALPHA PARTICLE RADIATION
IN THE MOBILE HOME PARK's WELL WATER**

8.     Collier initially developed and then subsequently leased individual lots in the Autumn Hills Mobile Home Park ("Autumn Hills") to tenants and provided them with certain basic services, including water.

9.     The water that Collier pumped into the homes of its tenants in Autumn Hills came from two wells.

10.     From 1998 to 2008, this well water contained unacceptable elevated levels of alpha particles.  An alpha particle is a subatomic particle consisting of two protons and two neutrons.  Although an alpha particle is not a solid, liquid, or gas, when alpha particles are present in elevated amounts it results in a type of radiation that causes damages to human tissues and is a known carcinogen (referred hereinafter to as "alpha particle radiation").

11.     For a number of years, the tenants were unaware that the water in Autumn Hills was tainted by alpha particle radiation and they consumed the water and used it for everyday household purposes.

12.     On March 5, 2008, the Underlying Lawsuit against Collier was initiated by the filing of a multi-count petition, including a negligence claim, on behalf of a proposed class of tenants of Autumn Hills for bodily injuries and property damages caused by drinking and using the water containing alpha particle radiation.

13.     On January 29, 2009, after a full briefing and a contested hearing, this Court, over the objection of Collier, certified a class of residents who lived in Autumn Hills in Lincoln County, Missouri, who were exposed to elevated levels of alpha particle radiation from water pumped into their homes.  As amended by Order dated January 10, 2013, the class ("Class") includes:

> All persons who were tenants, members of the immediate household of a tenant, or who have otherwise resided, or consumed water pumped into any mobile home at any point in time from January 1, 1998 to January 1, 2009, in the Autumn Hills Mobile Home Park located in Old Monroe, Lincoln County, State of Missouri.

## THE COMMERICAL GENERAL LIABILITY INSURANCE POLICIES

14.     Upon information and belief, Collier had corporate liability insurance, *i.e.*, Commercial General Liability ("CGL") policies, from a variety of insurance companies, including EMC, Capitol Indemnity, and OIC, at differing time periods from 1999 through 2008.

15.     At all relevant times, the required premiums for the CGL policies were paid by Collier.

16.     After receiving service of the Underlying Lawsuit, Collier made a demand for

coverage on each of the Insurers.

## DEFENDANT EMC'S DENIAL OF
## COVERAGE UNDER CGL POLICIES

17.     For the entire and continuous period of time between March 13, 1999 to March 13, 2000, there was in existence and in full force and effect a CGL policy of insurance, policy number 1 D9 92 87, between EMC and Collier.

18.     For the entire and continuous period of time between March 13, 2000 to March 13, 2001, there was in existence and in full force and effect a CGL policy of insurance, policy number 1 D9 92 87, between EMC and Collier.

19.     For the entire and continuous period of time between March 13, 2001 to March 13, 2002, there was in existence and in full force and effect a CGL policy of insurance, policy number 1 D9 92 87, between EMC and Collier.

20.     Collier sent a copy of the petition filed in the Underlying Lawsuit and made a demand for indemnity and defense of the Underlying Lawsuit to its insurer EMC under each of these policies.

21.     On July 31, 2008, EMC denied coverage under the CGL Policy 1D9 92 87 for the claims asserted in the Underlying Lawsuit and further denied that EMC had any duty to defend Collier under the CGL Policy.

22.     EMC was given the opportunity to defend Collier in the Underlying Lawsuit but refused to do so.

## DEFENDANT CAPITOL INDEMNITY'S DENIAL OF
## COVERAGE UNDER CGL POLICIES

23.     For the entire and continuous period of time between April 1, 2003 to April, 2004 there was in existence and in full force and effect CGL policy of insurance, policy number

5

CP00189527, between Capitol Indemnity and Collier.

24.     For the entire and continuous period of time between April 1, 2004 to April, 2005 there was in existence and in full force and effect CGL policy of insurance, policy number CP00189527, between Capitol Indemnity and Collier.

25.     Collier sent a copy of the petition filed in the Underlying Lawsuit and made a demand for indemnity and defense of the Underlying Lawsuit to its insurer Capitol Indemnity under policy number CP00189527.

26.     Capitol Indemnity initially agreed to provide a defense to the Underlying Lawsuit on behalf of its insured, Collier.   However, on August 1, 2008, Capitol Indemnity denied coverage under the CGL Policy CP00189527 for the claims associated in the Underlying Lawsuit and further denied that Capitol Indemnity had any duty to defend Collier under the CGL Policy and thereby withdrew its defense effective August 15, 2008.   Thus, Capitol Indemnity was given the opportunity to defend Collier in the Underlying Lawsuit and refused to do so.

**DEFENDANT OIC'S DENIAL OF**
**COVERAGE UNDER CGL POLICIES**

27.     For the entire and continuous period of time between April 1, 2005 to April 1, 2006, there was in existence and in full force and effect a CGL policy of insurance, policy number 052305-0739386-05, between OIC and Collier.

28.     For the entire and continuous period of time between April 1, 2006 to April 1, 2007, there was in existence and in full force and effect a CGL policy of insurance, policy number 052305-0739386-06, between OIC and Collier.

29.     For the entire and continuous period of time between April 1, 2007 to April 1, 2008, there was in existence and in full force and effect a CGL policy of insurance, policy number 052305-0739386-07, between OIC and Collier.

30.     For the entire and continuous period of time between April 1, 2008 to April 1, 2009, there was in existence and in full force and effect a CGL policy of insurance, policy number 052305-0739386-08, between OIC and Collier Organization.

31.     Collier sent a copy of the petition filed in the Underlying Lawsuit and made a demand for indemnity and defense of the Underlying Lawsuit to its insurer OIC under policy numbers: 052305-0739386-05; 052305-0739386-06, 052305-0739386-07, and 052305-0739386-08.

32.     On July 31, 2008, OIC denied coverage under the CGL Policies for the claims associated in the Underlying Lawsuit and further denied that OIC had any duty to defend Collier under the CGL Policies.

33.     OIC was given the opportunity to defend Collier in the Underlying Lawsuit but refused to do so.

34.     After Collier hired independent counsel for defense of the lawsuit, Plaintiffs voluntarily moved to set aside the Default Judgment previously granted to them by the Court.

### THE JUDGMENT:  LIABILITY AND CLASS DAMAGES

35.     On December 10, 2012, during an evidentiary hearing on liability, Plaintiffs presented substantial evidence to the Honorable David H. Ash of the Circuit Court of Lincoln County, Missouri, including numerous exhibits, reports of various experts, excerpts from deposition testimony, and affidavits.  Based on the evidence, Judge Ash entered his Findings of Fact, Conclusions of Law and Judgment on December 14, 2012 (herein "Liability Judgment"). A copy of the Judgment on Liability is attached hereto as Exhibit No. 1 and incorporated as if fully set forth herein.

36.     In the Liability Judgment, the Court made the following determinations, among

others, based on the evidence presented:

> • [W]hen an individual ingests, inhales, or injects alpha particle emitters and alpha particle radiation into his or her body, alpha particle radiation is extremely harmful.  Alpha particle radiation can penetrate the lining of the stomach, intestine, lungs, and blood vessels.  Once inside the body, alpha particle radiation will damage internal tissue and organs with many negative effects.

> • [I]nternal exposure to alpha particle radiation is carcinogenic and has been known to cause numerous types of cancer.  Internal exposure to alpha particle radiation is especially linked to lung cancer, bladder cancer, and stomach cancer.  Even short term internal exposure to a limited amount of alpha particle radiation can cause the development of cancerous cells.

> • [L]ong term internal exposure to alpha particle radiation has also been linked with birth defects and infertility.

37.     The Court held that, based on the evidence, once a person has internal exposure to alpha particle radiation, the individual has suffered a bodily injury.

38.     The Court found that Plaintiffs ingested the water for a number of years and used the water for a variety of household purposes, including cooking, bathing, washing dishes, and cleaning clothes.  The Court also found that Plaintiffs have suffered bodily injuries that were proximately caused by the ingestion and other common domestic use of the radioactive water that was pumped into their homes.

39.     The Court further found that at a certain point in time Plaintiffs learned that the water was radioactive and they had to buy their own water to drink and use.  This limitation on the use of Plaintiffs' own property constitutes property damage caused by the radioactive water that was pumped into their homes.

8

40.     The Court also found that Plaintiffs suffered property damages because of the decrease in the fair market value of their mobile homes caused by radioactive water being pumped into the homes.

41.     Ultimately, after reviewing extensive evidence and a full hearing, the Court entered its Findings of Fact, Conclusions of Law and Judgment ruling, among other things, that: (1) Collier is liable to the Class for claims of negligence and trespass; and (2) members of the Class, in fact, suffered bodily injuries and property damages that were proximately caused by Collier's negligence and trespass.  Also, in that Judgment on Liability, the Court set a future hearing to determine the extent of damages resulting from Collier's conduct.

42.     On August 28, 2013, after notice to all parties and to the Class, the Court in the Underlying Lawsuit heard additional evidence regarding the extent of damages suffered by the members of the Class.

43.     Based on the evidence adduced at the damages hearing, and the evidence previously presented, Judge Ash found that the Class had suffered injury and had been damaged in the total amount of $82,037,000, plus post-judgment interest at the maximum statutory rate. Specifically, the Court found that the Class has suffered bodily injury and been damaged in the amount of $70,085,000 (an average per class member just over $26,000) and suffered an additional $11,952,000 for property damage (an average for each mobile home just over $30,000).  A copy of the Judgment is attached hereto as <u>Exhibit No. 2</u> and incorporated as if fully set forth herein ("Final Judgment").

## DEFENDANT INSURERS ARE BOUND BY FACTUAL DETERMINATIONS OF LIABILITY AND DAMAGES CONTAINED IN THE JUDGMENT

44.     EMC, Capitol Indemnity, and OIC are bound in this equitable action by all of

Judge David Ash's factual determinations made in his Final Judgments on Liability and Damages that necessarily concern either (a) the liability of Collier for its negligent acts and trespass or (b) the extent of the respective injuries and the amount of damages sustained by the class as a result of Collier's negligent acts and trespass.

45.     EMC, Capitol Indemnity and OIC are precluded from relitigating the issues of liability and damages in the present action because it wrongfully refused to defend Collier in the Underlying Lawsuit when they had every opportunity to do so under the applicable CGL Policies.

## DEFENDANT INSURERS' UNJUSTIFIABLE DENIAL OF COVERAGE AND REFUSAL TO DEFEND

46.     The damages sustained by the Class that were caused by the "occurrences" (*i.e.,* continuous or repeated exposure to substantially the same general harmful conditions) of the insured Collier pumping radioactive water into the homes of the members of the Class in the "coverage territory" (*i.e.,* Lincoln County, State of Missouri, United States of America) during the policy periods constituted "bodily injury" and "property damages" to which the CGL Policies apply.

47.     The Insurers' denial of coverage and refusal to defend Collier constituted a breach of the Insurers' contractual duty to indemnify and defend because the petition in the Underlying Action alleged damages for "bodily injury" and "property damage" for which Collier would become legally obligated to pay in the event that a future judgment was to have been entered against it in the Underlying Lawsuit.

48.     None of the exclusions in the CGL Policies are applicable.

49.     The Insurers are liable and responsible for all damages resulting from their aforementioned denial of coverage and breach of their agreements to defend their insured,

Collier.

50.     As a result of the Final Judgment, Collier, the insured, under the above-referenced CGL Policies, is now legally obligated to pay as damages the total amount of $82,037,000, plus post-judgment interest at the maximum statutory rate, to the Class.

**EQUITABLE GARNISHMENT**
**PURSUANT TO §379.200, R.S.Mo.**

51.     Pursuant to § 379.200, R.S.Mo., Plaintiffs are judgment creditors of Collier, an insured under each of the CGL Policies, as a result of the Final Judgment entered against it on August 28, 2013 for damages by reason of Plaintiffs having sustained and proved "bodily injury" and "property damage."

52.     Plaintiffs are thus entitled to recover and apply the insurance money in the amount provided in the "Each Occurrence Limit" on the Declarations Page of each of the CGL Policies, in addition to an amount reflecting the award of statutory post-judgment interest accruing on the full amount of the Judgment in satisfaction of the Final Judgment because defendant Collier Organization was insured by Defendant Insurers against the damages sustained by the Plaintiffs.

53.     In accordance with § 379.200, R.S.Mo., Plaintiffs bring this action more than thirty (30) days after having obtained the Final Judgment and it remains completely unsatisfied as of the filing of this Petition.

WHEREFORE, Plaintiff Barbara Williams, class representative, prays for a judgment under this Petition for Equitable Garnishment in favor of the Class and against Defendants EMC, Capitol Indemnity, and OIC in the total amount of $82,037,000, plus post-judgment interest at the maximum statutory rate, subject only to the applicable limits of liability expressly and unambiguously stated in the aforementioned CGL Policies and issued by Defendants EMC,

Capitol Indemnity, and OIC; and the sum which represents the set rate of nine percent interest

(9%) from and after entry of the Final Judgment on August 28, 2013 until Defendants EMC,

Capitol Indemnity, and OIC have paid or deposited into Court that part of the Final Judgment

that is within the applicable limits as provided for in the aforementioned CGL Policies and

issued by Defendants EMC, Capitol Indemnity and OIC; and such costs as Plaintiffs have herein

expended; and such other sums and further relief as this Court deems just and proper under the

premises.


Respectfully submitted,

BERRY & MAXSON LLC


Robert P. Berry, #46236
Kelley F. Farrell, #43027
16150 Main Circle Drive, Suite 120
St. Louis, Missouri  63017
(314) 480-5881
(314) 480-5884 (facsimile)
rberry@berrymaxson.com
kfarrell@berrymaxson.com

Timothy A. Engelmeyer, #39941
Tony A. Pezzani, #562900
Engelmeyer & Pezzani, LLC
13321 North Outer Forty Road, Suite 300
Chesterfield, Missouri  63017
(636) 532-9933
(314) 863-7793 (facsimile)
tim@epfirm.com
tony@epfirm.com

William W. Cheeseman, #35514
Law Office of William W. Cheeseman
1124 East Cherry Street
P. O. Box 343
Troy, Missouri  63379
(636) 528-5299
(636) 462-6201 (facsimile)
cheesemanlaw@hotmail.com

Kevin C. Roberts, 31578
Attorney at Law
Roberts, Wooten & Zimmer, LLC
10438 Highway 21
P. O. Box 888
Hillsboro, Missouri 63050
(636) 797-2693
(636) 789-4205 (facsimile)
KevinRoberts@rwzlaw.com

## IN THE CIRCUIT COURT OF LINCOLN COUNTY, MISSOURI
### CIRCUIT JUDGE DIVISION

BARBARA WILLIAMS, et.al.,                    )
                                             )
      Plaintiffs,                        )
                                             )
v.                                           )
                                             )    Cause No. 08L6-CC00042
                                             )    Div. IV
THE COLLIER ORGANIZATION, INC., et. al.,     )
                                             )
      Defendants.                        )
                                             )

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

Plaintiffs, a class of tenants who lived in the Autumn Hills Mobile Home Park in Lincoln County, are suing defendants The Collier Organization, Inc., Triad Development Company and Triad Development for pumping water with excess levels of radiation into their mobile homes for a number of years and thereby caused damages. Over objection of defendants, this Court previously certified Plaintiffs' proposed class and appointed class representatives. This Court then entered an interlocutory default judgment on Plaintiffs' petition and set the matter for a hearing on damages. Subsequently, defendants had new counsel enter an appearance on this matter.

Upon motion of Plaintiffs and, with notice to defendants The Collier Organization, Triad Development Company, and Triad Development, the Court set aside its interlocutory default judgment on Plaintiffs' petition and set this matter for an evidentiary hearing on liability on December 10, 2012. Parties appeared by counsel for the hearing. Prior to the start of the hearing, Plaintiffs dismissed without prejudice their claims against Triad Development Company and Triad Development and proceeded against The Collier Organization, Inc. as the only remaining defendant in this matter.

1

EXHIBIT
1

Prior to the presentation of evidence, Plaintiffs also filed a "Request for Findings of Fact and Conclusions of Law as the Court's Grounds for its Decision." The Court has attempted to address each of the issues raised by Plaintiffs and has also included any additional matters it deemed relevant and necessary to its determination.

The Court has been presented with and has considered deposition testimony, several affidavits, state government records, exhibits and testimony from Plaintiffs' class representative. The Court admitted all of the evidence presented and took judicial notice of the Missouri Statutes and Code of State Regulations cited herein. At the conclusion of their evidence, Plaintiffs moved that the pleadings be conformed to the evidence presented at the hearing. The Court granted Plaintiffs' motion and deems the pleadings to be appropriately amended.

In sum, the Court finds in favor of Plaintiffs and against defendant Collier Organization, Inc. on the issue of liability for Plaintiff's negligence and trespass claims and sets this matter for a damages hearing on _____. The Court also dismisses without prejudice all other claims in the case, including any other remaining claims of Plaintiffs or counterclaims of defendants. Based on the evidence adduced at the hearing, the Court's factual findings and legal conclusions are as follows.

## FINDINGS OF FACT AS TO LIABILITY

The Court makes the following findings of fact:

### Parties

1.      From 1997 until at least January 1, 2009, Defendant The Collier Organization, Inc. ("Defendant") was in the business of owning and managing a mobile home park in Old Monroe in Lincoln County, State of Missouri, known as Autumn Hills Mobile Home Park ("the Park").

2.      Plaintiffs are a class of persons who from January 1, 1998 to January 1, 2009 have paid rent for their tenancy, as well as members of their immediate household who reside or resided with them, at the property located in Lincoln County, State of Missouri, and which is commonly known as the Autumn Hills Mobile Home Park.

## Development of Autumn Hills Mobile Home Park

3.      Defendant began its development of this property in 1997.  Defendant leased lots in the Park to tenants, who would pay Defendant regularly for the right to have their mobile homes remain in the Park.

4.      At one point, Defendant had over three hundred tenants renting space in the Park.

5.      As part of its standard lease agreement, Defendant promised to provide tenants with certain basic services, including water, electricity and a laundry facility.  Defendant's provision of water for basic domestic uses is central to the present matter.

6.      The Court finds that Defendant did not sell the water separately nor did it offer any warranty on the quality of water provided to the tenants.  Defendant's primary work and/or product were providing the lots for its tenants to place their mobile homes in the Park.

## Missouri Department of Natural Resources' Investigation and Monitoring

7.      To provide tenants with potable water, Defendant developed plans to dig two wells that would serve the Park.  In 1997, Defendant submitted plans for digging these two wells to the Missouri Department of Natural Resources ("DNR").

8.      On or about February 24, 1998, the DNR approved Defendant's application. Defendant completed construction of these two wells by September 1998, and the Park's public water system became fully operational in November 1998.

9.      Under Missouri Revised Statute § 640.100, the Missouri Safe Water Drinking

Commission of the DNR is charged with the responsibility of promulgating rules regulating the cleanliness and safety of Missouri's drinking water.

10.      In 10 CSR 60-4.060(1)(A) and (B) the DNR sets out the maximum contaminant level for combined radium-226 and radium-228 as five picocuries per liter (5 pCi/L) and gross alpha particle activity (including radium-226 but excluding radon and uranium) as fifteen picocuries per liter (15 pCi/L).

11.      On January 1, 1999, the DNR conducted its final approval inspection of the Park's public drinking water system.  The DNR's report stated that the Park's water had gross alpha particle activity level above the maximum level elevated allowed by 10 CSR 60-4.060(1), and was therefore excessively radioactive.

12.      Despite the radioactive nature of the water, on March 11, 1999, the DNR recommended a "Temporary Permit to Dispense" that allowed Defendant to provide water from the two wells to tenants on the Property.

13.      Defendant received a "Missouri State Operating Permit" from the DNR, allowing it to pump water publicly as of April 23, 1999.

14.      Pursuant to the rights granted by the Operating Permit, Defendant pumped water from the two wells into the mobile homes of the Park's tenants from 1999 to 2008.

15.      Starting in January 2002, the DNR began sending Defendant notices relating to the radiation level in the Park's two wells.

16.      In the first notice, dated January 29, 2002, DNR informed Defendant that "based on your historical monitoring record, your water system may be deemed in noncompliance [of Missouri's Radionuclide Rule] on December 8, 2003."

17.      In a notice dated July 3, 2002, DNR similarly warned Defendant "that water

4

samples collected from the two wells serving the Autumn Hills Mobile Home Park indicate the water system may exceed the Maximum Contaminant Level for Gross Alpha Particle activity[.]" The notices soon turned from warnings to a notices of violation.

18.     On June 9, 2004, DNR informed Defendant "[b]ecause it has been determined that your system has exceeded [a Maximum Contaminant Level] you are being issued the notice of violation included in this packet."

19.     Similarly, on November 10, 2005, DNR sent Defendant notice stating, "Missouri Department of Natural Resources and the U.S. Environmental Protection Agency . . . have identified your public water system as a Significant Non-Complier with the radionuclide contaminant requirements in violation of 10 CSR 60-4.060." This letter also took the first steps toward enforcement and required that Defendant enter into a Bilateral Compliance Agreement ("BCA") designed to correct the excessive levels of Gross Alpha Particle Activity in the Park's drinking water.

20.     Defendant executed the required BCA on October 27, 2006, but soon fell afoul of its requirement by failing to issue public notice of the water's radiation level.

21.     On December 13, 2006, DNR sent Defendant a Notice of Violation for Failure to Perform Public Notice in accordance with the BCA.  DNR's documents show that Defendant continued in non-compliance.

22.     Tests performed by DNR demonstrate that for all points from November 1999 to July 2006, the Gross Alpha Particle Activity level and Radium 226 in the water being pumped from the Park's two wells exceeded the limits set by Missouri law.

23.     Defendant continued pumping water into the mobile homes in the Park at least until December 31, 2008.

## Defendant's Intentions

24.     Defendant states that, although the DNR issued these notices to the Defendant regarding the condition of the water being pumped and made various recommendations concerning it, the DNR did not revoke the Company's Missouri State Operating Permit for pumping water.

25.     Given that DNR allowed Defendant to continue to have a permit, Defendant did not believe there was any harmful effects or damages to any tenants or property in the Park caused by the condition of water until Defendant was served with this lawsuit.

26.     Defendant also did not expect that the condition of the water from the two wells was causing or did cause harm and/or damage to any person or property in the Park.

27.     Defendant never intended to cause harm or damage to any person or property in Autumn Hills by pumping the water from the two wells.

## Unacceptable Levels of Radiation in the Water

28.     Plaintiff's expert Dr. Mark G. Alford, a physicist and the Department Chair of the Physics Department at Washington University in St. Louis, explained that the tests show that from 1998 through 2006, Gross Particle Activity levels in Well 1 range from 24.8 ±3.5 pCi/L to 45 pCi/L and in Well 2 range from 13.4 ± 2.5 pCi/L to 96.6 pCi/L.  Some of the DNR's tests do not identify the specific well from which the test samples are taken.  For these unidentified samples the Gross Alpha Particle Activity levels range from 27.6 pCi/L to 56.6 pCi/L.  DNR tests show that during this period, Radium 226 levels in Well 1 range from 9.7 pCi/L to 11.4 pCi/L and in Well 2 range from 10.4 pCi/L to 25.2 pCi/L.  Some tests do not identify the specific well from which the test samples are taken.  For these unidentified samples the Radium 226 levels range from 10.7 pCi/L to 14.1 pCi/L.

29.    Dr. Alford explained the nature of Gross Alpha Particles and Radium 226. Both measures refer to the level of a common type of radiation—known as alpha particle radiation—in the well water.

30.    Dr. Alford testified regarding the nature of alpha particle radiation. An alpha particle is a subatomic particle consisting of two protons and two neutrons. Although alpha particles have mass, alpha particles are subatomic and are therefore not classifiable as solid, liquid, or gas. Alpha particles have a positive net charge and a net spin of zero. Alpha particles come from certain elements as they go through a process known as alpha decay. Alpha decay causes an element to emit alpha particles.

31.    Dr. Alford also testified that alpha particle emission is a common type of radiation, known as alpha particle radiation and is widely found in nature. Alpha particle radiation may be accompanied by heat in certain circumstances, but alpha particles are not inherently thermal.

32.    Dr. Alford explained that alpha particle radiation is a form of ionizing radiation. Ionizing radiation is radiation composed of particles or waves that carry enough energy to destabilize an atom or molecule by dislodging an electron and thus ionizing that atom or molecule. Sufficiently high levels of ionizing radiation can be harmful to organic material, causing conditions such as radiation poisoning.

33.    Dr. Alford also testified that alpha particle radiation has very low penetration depth relative to other forms of ionizing radiation. This means that alpha particle radiation can be stopped by a few centimetres of air, a piece of paper, or human skin. Therefore, alpha particle radiation that is external to the body is typically not an an irritant to humans and alpha particles can occur at low levels in drinking water without contaminating it. However, despite its relative

low penetration depth, elevated amounts of alpha particle radiation may cause damage to unprotected, internal tissues of the human body, such as the lining of the stomach and intestines.

34.     DNR and private laboratory test categories test categories Gross Alpha and Gross Alpha Particles simply refer to the total alphas particles in the water coming from all sources. These sources include Radium 226, Radium 228, and all other elements emitting alpha particles. For purposes of the measuring the amount of alpha particles in a sample of water, Gross Alpha or Gross Alpha Particles acts as the aggregate total, and is the relevant measure.

35.     I find Dr. Alford's expert testimony to be credible and adopt it as the Court's findings.

## Plaintiffs' Damages

36.     Plaintiff's expert, Patsy A. Howard, a registered nurse and health care professional with more than 30 years of experience, testified that when an individual ingests, inhales, or injects alpha particle emitters and alpha particle radiation into his or her body, alpha particle radiation is extremely harmful.  Alpha particle radiation can penetrate the lining of the stomach, intestine, lungs, and blood vessels.  Once inside the body, alpha particle radiation will damage internal tissue and organs with many negative effects.

37.     Nurse Howard also testified that internal exposure to alpha particle radiation is carcinogenic and has been known to cause numerous types of cancer.  Internal exposure to alpha particle radiation is especially linked to lung cancer, bladder cancer, and stomach cancer.  Even short term internal exposure to a limited amount of alpha particle radiation can cause the development of cancerous cells.

38.     Nurse Howard also testified that persistent internal exposure to alpha particle radiation over months or years can also cause Chronic Radiation Syndrome. Chronic Radiation

8

Syndrome develops with a speed and severity proportional to the radiation dose received, *i.e.* it is a deterministic effect of radiation exposure. Common symptoms of Chronic Radiation Syndrome are recurrent infections, low grade fever, loss of appetite, weakness and fatigue, fainting, dehydration, inflammation (swelling, redness or tenderness of tissues), hair loss, bruises, and anemia. Additionally, long term internal exposure to alpha particle radiation has also been linked with birth defects and infertility.

39.     Thus, the Court finds that based on the expert testimony of Dr. Alford and Nurse Howard, which the Court finds credible and admissible, that once a person has internal exposure to alpha particle radiation, the individual has suffered a bodily injury. The only question is to what degree the body is injured.

40.     Plaintiff class representative Barbara Williams also testified that she drank the water for several years before finding out the water had high levels of radiation. She testified that she now worries about and has anxiety about the radiation effects on her health.

41.     Plaintiff Williams further testified that at some point when she found about the radiation in the water that she had to start buying bottled water for her personal and household uses. The Court finds that this expense incurred by Plaintiffs is compensable as property damage.

42.     Plaintiff Williams also testified that she purchased her mobile home for $45,000. It is Plaintiff Williams' opinion that because her mobile home has had radiation pumped through it for a number of years, and she would have to disclose that fact to a potential buyer her mobile home, that the fair market value of her mobile home is zero. An owner's opinion of the value of their property is admissible on the element of property damages.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

A. Negligence

1.     To succeed on a claim for negligence under Missouri law a plaintiff must establish "(1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty; (3) a proximate cause between the conduct and the resulting injury; and (4) actual damages to the plaintiff's person or property." *Hoover's Dairy, Inc. v. Mid-America Dairyment, Inc./Special Products, Inc.*, 700 S.W.2d 426, 431 (Mo. 1985).

2.     The Court finds that Plaintiffs have successfully established each of these elements in their claim for negligence.

3.     The Court finds Defendant undertook to pump water from two wells into Plaintiffs' homes.  In doing so, Defendant was under a legal duty to ensure the relative safety of the water it pumped.  This duty arises from the requirements set forth by the Missouri Department of Natural Resources in the regulations it promulgates pursuant to its authority under Missouri Revised Statutes § 640.100 et. seq.  Specifically, Defendant had a legal duty to pump water with combined radium-226 and radium-228 levels below five picocuries per liter (5 pCi/L) and with Gross Alpha Particle Activity below fifteen picocuries per liter (15 pCi/L).  10 CSR 60-4.060(1)(A) and (B).

4.     The Court finds Defendant breached this legal duty by pumping water with levels of combined radium 226 and radium 228 and Gross Alpha Particle Activity levels that exceeded the established maximums by the DNR.  Every notice, report, and test discussing the combined

10

radium 226 and radium 228 level and the gross alpha particle level presented to this Court has shown this breach.

5.     The Court finds that Defendant's breach was continuous and spanned from at least January 22, 1999 through December 31, 2008; the entirety of the time Defendant pumped water from its wells.

6.     Plaintiffs have presented expert testimony as to the nature of alpha particle radiation and its effects on the human body.  This evidence indicates that when alpha particle radiation enters the body through an act such as ingestion, the alpha particles immediately injure internal tissue.

7.     The Court finds that Plaintiffs ingested the water for a number of years and used the water for a variety of household purposes, including cooking, bathing, washing dishes, and cleaning clothes.  The Court therefore finds that Plaintiffs have suffered bodily injuries that were proximately caused by the ingestion and other common domestic use of the radioactive water that was pumped into their homes.

8.     Plaintiffs have also presented evidence that at a certain point in time they realized the tainted nature of the water being pumped into their homes and stopped using it for most domestic purposes.  Thereafter, Plaintiffs substituted bottled water they purchased at their own expense for the water they were paying Defendant to pump into their homes.  The Court finds this limitation of use of their property demonstrates that Plaintiffs have also suffered property damage that was proximately caused by the radioactive water that was pumped into their homes.

9.     Now, therefore, the Court finds that Plaintiffs have established all the elements required to find Defendant negligent in its operation of pumping water from the two wells into the homes of the Park.  When undertaking to pump water into homes, Defendant had a duty to

follow the regulations established by the DNR and pump water below certain levels of radiation. Defendant breached this duty by continuously pumping water that exceeded these radiation levels. The pumping of this water proximately caused both bodily and property damages to Plaintiffs.

10.     Having established Defendant's liability, a future hearing will be held to determine extent of damages resulting from Defendant's negligence.

B. Trespass

11.     To succeed on a claim for trespass under Missouri law, a plaintiff must show 1) he or she had the legal right to possession of the land or building and 2) the defendant made an unauthorized entry upon the property. *Crook v. Sheehan Enterprises, Inc.*, 740 S.W.2d 333, 335 (Mo. App. E.D. 1987) ("Trespass is the unauthorized entry by a person upon the land of another, regardless of the degree of force used, even if no damage is done, or the injury is slight."); *Holster v. Green Park Development Co.*, 986 S.W.2d 500, 506 (Mo. App. E.D. 1999) ("To support an action for trespass, the party making the claim must have the legal right to possession."); *Hamilton Hauling, Inc. v. Avenue Auto Wrecking, Inc.*, 883 S.W.2d 540, 542 (Mo. App. W.D. 1994) ("Trespass is the unauthorized entry upon the property of another.").

12.     Based on the evidence presented, the Court finds that Plaintiffs have successfully established each of these elements in their claim for trespass.

13.     The Court finds that Plaintiffs meet the first element as they owned their own mobile home buildings and had a binding lease with Defendant to keep their mobile homes on certain portions of land within the Park.

14.     The Court finds that Plaintiffs meet the second element as they showed that Defendant pumped radioactive water into their mobile homes without authority to do so.

15.    To find a trespass, it is not necessary to find that an individual personally entered into a plaintiff's building or onto his or her land. "The term 'entry by a person' certainly includes entry by [an] object as a result of that person's actions." *Rosenfeld v. Thoele*, 28 S.W.3d 446, 449 (Mo. App. E.D. 2000). Moreover, Missouri courts have held that "radioactive emissions may constitute trespass." *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc.* 706 S.W.2d 218, 226 (Mo. App. E.D. 1986). The Court finds that the pumping of water with excessive levels of alpha particle radiation constitutes "entry upon the property" sufficient to find a trespass.

16.    Defendant had been licensed to pump water into Plaintiffs' homes under the terms of their lease. However, Defendant had not been licensed to pump radioactive water into Plaintiffs' homes. In doing so, Defendant exceeded its authority for entry into Plaintiffs' homes under the license provided in the lease. "One can commit the tort of trespass . . . by exceeding the scope of any license to enter upon the land." *Ogg v. Mediacom, L.L.C.*, 142 S.W.3d 801, 809 (Mo. App. W.D. 2004) (quoting *Cochran v. Burger King Corp.*, 937 S.W.2d 358, 362 (Mo. App. W.D. 1996). The Court finds that the pumping of water with excessive levels of alpha particle radiation exceeded the scope of any license to enter Plaintiffs' property and therefore constituted and unauthorized entry.

17.    The Court finds that Defendant did not expect or intend for this trespass to result from its operations of pumping water into Plaintiffs' homes. However, "[l]iability for trespass exists whether or not done in good faith and with reasonable care, in ignorance or under mistake of law or fact." *Hostler v. Green Park Development Co.*, 986 S.W.2d 500, 506 (Mo. App. E.D. 1999). Therefore, Defendant's mindset and intentions is not an issue and Defendant is liable for trespass.

18.    A proven trespass always results in nominal damages and it is therefore not necessary for Plaintiffs to show actual damages.  *Smith v. Woodard,* 15 S.W.3d 768, 773 (Mo. App. S.D. 2000) ("In cases alleging trespass, it is not necessary that damage result because trespass entitles the wronged party to nominal damages.").   However, damages beyond the nominal can be shown and recovered.  *See Curtis v. Fruin-Colnon Contracting Co.,* 253 S.W.2d 158, (Mo. 1952) ("[D]efendant is responsible for damages to plaintiffs' property naturally and necessarily resulting from the trespass."). Here, Plaintiffs have presented personal injury damages and property damages in two different ways – inability to use their property and damage to the fair market value of their mobile homes due to the radioactive water being pumped into them.  Having established Defendant's liability, a future hearing will be held to determine extent of damages resulting from Defendant's continuing trespass.

## CONCLUSION

For the foregoing reasons, this Court finds Defendant, The Collier Organization, Inc., liable to Plaintiffs for damages resulting from negligence and trespass.  This Court shall hold a further hearing to determine the extent of damages on March 11, 2013 at 1:30 PM.

So Ordered.

Date:   12/14/12

David N Ash
25440

Hon. David H. Ash, Judge

IN THE CIRCUIT COURT OF LINCOLN COUNTY, MISSOURI
CIRCUIT JUDGE DIVISION

BARBARA WILLIAMS, et.al.,                   )
                                            )
   Plaintiffs,              )
                                            )
v.                                          )  Cause No. 08L6-CC00042
                                            )  Div. IV
                                            )
THE COLLIER ORGANIZATION, INC., et. al.,    )
                                            )
   Defendants.              )

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT ON CLASS DAMAGES

On January 29, 2009, after full briefing and a contested hearing, this Court certified a class of residents who lived in the Autumn Hills Mobile Home Park ("Autumn Hills") in Lincoln County, Missouri, who were exposed to elevated levels of alpha particle radiation from water pumped into their homes. Specifically, as amended by Order on January 10, 2013, the certified class includes:

> All persons who were tenants, members of the immediate household of a tenant, or who have otherwise resided, or consumed water pumped into any mobile home at any point in time from January 1, 1998 to January 1, 2009, in the Autumn Hills Mobile Home Park located in Old Monroe, Lincoln County, State of Missouri.

Additionally, after reviewing extensive evidence and a full hearing, on December 14, 2012, this Court entered its Findings of Fact, Conclusions of Law and Judgment ruling, among other things, that: (1) Defendant The Collier Organization, Inc. ("Collier") is liable to the class for claims of negligence and trespass; and (2) members of the class, in fact, suffered bodily injuries and property damages that were proximately caused by Collier's negligence and trespass.[1]  In that

---

[1] Plaintiffs' counsel gave notice to the class pursuant to the Court's January 10, 2013 Order.  The Court finds that such notice was fully completed and holds that the class notice given was consistent with both Missouri law and due process.

1

EXHIBIT
2

December 14, 2012 Order, the Court set a future hearing to determine the extent of damages resulting from Collier's conduct.

On August 28, 2013, after notice to all parties and to the class, class counsel came before this Court to present its additional evidence regarding the extent of damages suffered by the members of the class. In connection with this determination of the amount of damages, the Court has been presented with and has considered testimony and exhibits, expert testimony, state government records, official U.S. census data, and other evidence. This Court has also considered all 58 separate Findings of Fact and Conclusions of Law entered in the December 14, 2012 Order. Further, the Court has taken into consideration all other evidence, law, and arguments previously submitted by the parties that are found in the Court's record.

After considering all of this evidence, evaluating the credibility of all witnesses, and the relevant law, the Court hereby admits into the record all evidence presented at the August 28, 2013 hearing. Additionally, at the conclusion of presenting their damage calculation evidence, Plaintiffs moved that the pleadings be conformed to the evidence presented at the hearing. The Court hereby grants Plaintiffs' motion and deems the pleadings to be appropriately amended.

The evidence of damages presented by class counsel is overwhelming. Based on the evidence adduced at the damage calculation hearing, and the evidence previously presented to this Court and considered as part of this Order, the Court finds that the class has suffered injury and has been damaged in the total amount of $82,037,000, plus post-judgment interest at the maximum statutory rate. Specifically, the Court finds that the class has suffered bodily injury and been damaged in the amount of $70,085,000 (an average per class member just over $26,000) and suffered an additional $11,952,000 for property damage (an average for each mobile home just over $30,000). Based on the evidence presented and as explained below, the

2

Court finds these amounts to be accurate, reasonable, and non-speculative. The Court's factual findings and legal conclusions on damages are as follows.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO AMOUNT OF DAMAGES

This Court previously held that Collier is liable to the class for claims of negligence and trespass and that members of the class, in fact, have suffered bodily injuries and property damages proximately caused by Collier's conduct. The question presently before this Court is how to calculate the damages arising from these injuries. In connection with this calculation of damages, Plaintiffs need not establish the amounts with absolute certainty, and it is reasonable to require a lesser degree of certainty so long as the evidence does not leave the matter to speculation. *Jefferson v. Am. Fin. Group, Inc.*, 163 S.W.3d 485, 489 (Mo. App. E.D. 2005); *Williams v. Daus*, 114 S.W. 3d 351, 362 (Mo. App. S.D. 2003) (*en banc*); *Bechtle v. Tandy Corp.*, 77 S.W.3d 689, 695 (Mo. App. W.D. 2002); *The Cadle Co. v. Shearer*, 69 S.W. 3d 122, 125 (Mo. App. W.D. 2002); *Ohlendorf v. Feinstein*, 670 S.W. 2d 930, 933 (Mo. App. E.D. 1984).

### The Size Of The Class

1.      Plaintiffs are a class of persons who from 1998 to January 1, 2009 have paid rent for their tenancy, as well as people who reside or resided with them, at the property located in Lincoln County, State of Missouri, and which is commonly known as the Autumn Hills Mobile Home Park.

2.      *Number of mobile homes.*   Plaintiffs submitted evidence that Autumn Hills consisted of approximately 398 mobile home units during the class period, consisting of development of Phase I and Phase II of the park. Numerous Collier documents submitted to the Missouri Department of Natural Resources ("DNR") confirm that Phase I of the park included

3

198 mobile homes and Phase II included 200 mobile homes. While the exact number of mobile homes in the park is impossible to verify given the passage of time, and the various removals and replacements of some homes, this number is fully consistent with the recollection of long-time resident Barbara Williams, who submitted an affidavit confirming that Phase I and Phase II were completed, that the mobile home park was "generally about full during the class period," and that there were "around 400" mobile homes in the park. Michelle Pratt, a member of the certified class, also testified that the park was generally full. The Court finds this evidence to be reasonable and credible and, therefore, finds that there were 398 mobile homes in Autumn Hills during the class period.

3.     *Number of residents per mobile home.* Plaintiffs submitted evidence of the average number of residents per mobile home unit in Autumn Hills during the class period. This evidence includes documents that Collier had submitted to DNR showing that, based on Collier's extensive experience developing "other mobile home parks and rental property," Collier estimated that 50% of the units at Autumn Hills would house an average of 2.5 people per unit, while the other 50% of the units would house an average of 3.5 people per unit. Collier's expectation, therefore, was that each mobile home in Autumn Hills would average 3 residents per unit. Collier's estimate is consistent with resident Barbara Williams' testimony that the park was largely occupied by "smaller families" most of which included "two to four people." Resident Michelle Pratt's testimony was again similar on this issue. Plaintiffs further submitted evidence from the U.S. Census Bureau (2010 Census), of which the Court also takes judicial notice, confirming that the average size of a family residing in Monroe Township in Lincoln County, Missouri, is 3.16 people and the average size of a household in Monroe Township is 2.78 people. The Court finds this evidence to be credible. Based on this evidence, the Court

4

finds that, on average, 3 people lived in each of the 398 mobile home units at any time during the class period. Accordingly, the Court finds that at any given time during the class period 1,194 people lived in Autumn Hills (398 units x 3 people per unit).

4. *Number of new residents per year.* The Court also takes into account the fact that new people moved into Autumn Hills during the class period. (The fact that some residents moved away would not decrease the class size, however, because the damage and the need for medical monitoring is the same no matter how long a resident remained in Autumn Hills, and therefore was exposed to excessive radioactivity, during the class period.) Barbara Williams and Michelle Pratt testified that new residents moved into Autumn Hills "frequently." Plaintiffs submitted further evidence using U.S. Census Bureau data showing that the average residential turnover rate for Missouri in 2010 was approximately 12.5% per year. The Court finds that this is a reasonable, and potentially conservative, rate to apply to the entire class period. Therefore, based on Autumn Hills' occupancy rate of 1,194 people, the 12.5% annual turnover rate yields an average of 150 new residents each year. This amounts to 1,500 new residents moving into Autumn Hills during the class period. The Court finds this evidence to be credible and, therefore, finds that there were on average 150 new residents at Autumn Hills each year during the class period.

5. *Total number of class members.* In summary, and based on the above evidence and findings, the Court finds that were approximately 2,694 total residents at Autumn Hills during the class period (398 units x 3 persons per unit + 12.5% annual turnover for ten years). The Court further finds that all 2,694 persons meet the class definition and, therefore, are members of the class who suffered injury by the negligence and trespass of Collier.

## Calculation Of Bodily Injury Damages Suffered By Each Class Member

6.     *The Court has already found unacceptably high levels of alpha particle radiation.*
Plaintiffs' expert Dr. Mark G. Alford, a Harvard and Oxford trained physicist and the
Department Chair of the Physics Department at Washington University in St. Louis, testified
that, based on his review and study, the DNR tests show the occurrences of unacceptably high
levels of alpha particle radiation in the Autumn Hills water supply during the class period.  In its
December 14, 2012 Order, this Court found the entirety of Dr. Alford's expert testimony to be
credible and adopted it as the Court's findings.  Without limitation, the Court found that the
occurrences of alpha particle radiation contamination impacting Autumn Hills involved
subatomic particles consisting of two protons and two neutrons and, therefore, is not classifiable
(as a matter of fact or law) as a solid, liquid, or gas.  The Court further found that alpha particles
are not by nature thermal.  Accordingly, while the Court found that the occurrences of alpha
particle radiation contamination at Autumn Hills during the class period caused both bodily
injury and property damages to class members, the Court finds that these injuries were not
caused by a pollutant.

7.     *The Court has already found bodily injury caused by Collier.*  Plaintiffs' experts
Dr. James Beattie, a board certified oncologist, and Patsy A. Howard, a registered nurse and
health care professional with more than 30 years of experience, testified that when an individual
ingests, inhales, or injects alpha particle emitters and alpha particle radiation into his or her body,
alpha particle radiation is extremely harmful.  Alpha particle radiation can penetrate the lining of
the stomach, intestine, lungs, bones, and blood vessels.  Once inside the body, alpha particle
radiation will damage internal tissue and organs with many negative effects.  Dr. Beattie and
Nurse Howard both testified that internal exposure to alpha particle radiation is carcinogenic and

6

has been known to cause numerous types of cancer. Internal exposure to alpha particle radiation is especially linked to lung cancer, bladder cancer, bone cancer, and stomach cancer. Even short term internal exposure to a limited amount of alpha particle radiation can cause the development of cancerous cells. Nurse Howard also testified that persistent internal exposure to alpha particle radiation over months or years can cause Chronic Radiation Syndrome. Chronic Radiation Syndrome develops with a speed and severity proportional to the radiation dose received, *i.e.* it is a deterministic effect of radiation exposure. Common symptoms of Chronic Radiation Syndrome are recurrent infections, low grade fever, loss of appetite, weakness and fatigue, fainting, dehydration, inflammation (swelling, redness or tenderness of tissues), hair loss, bruises, and anemia. Additionally, long term internal exposure to alpha particle radiation has also been linked with birth defects and infertility. Dr. Beattie confirmed the reasonableness and accuracy of Nurse Howard's December 7, 2012 and August 22, 2013 affidavits. After considering the evidence, this Court finds the entirety of Dr. Beattie's and Nurse Howard's expert testimony to be credible and adopts them as part of the Court's findings. The Court further finds that the evidence shows with a reasonable degree of medical certainty that each time a class member ingested or was exposed to the excessively radiated water, a new bodily injury occurred.

8.    *All class members have suffered bodily injury.* The Court finds with a reasonable degree of medical certainty that, based on the evidence presented, all 2,694 members of the class suffered such a bodily injury during the class period as a direct and proximate result of Collier's conduct, and that Collier is liable for damages arising therefrom.

9.    *Class members need to be medically monitored for 30 years.* In its January 29, 2009 class certification ruling, this Court ordered that "Plaintiff shall have the right to approach

7

the Court on the issue of medical monitoring if the evidence developed in this case supports it." The Court finds that the evidence, in fact, supports a remedy of medical monitoring with a reasonable degree of medical certainty. Dr. Beattie testified that, in his medical opinion, "people exposed to elevated levels of alpha particle radiation should be medically monitored to test for possible cancers and other diseases associated with such radiation exposure." Nurse Howard offered similar testimony. The Court finds this testimony reasonable and credible. In 2007, the Missouri Supreme Court confirmed that medical monitoring is an available remedy for torts. As the Supreme Court explained, "a medical monitoring claim seeks to recover the costs of future reasonably necessary diagnostic testing to detect latent injuries or diseases that may develop as a result of exposure" to harmful substances. *Meyer v. Fluor Corp.*, 220 S.W. 3d 712, 717 (Mo. banc 2007). However, medical monitoring does not create a new tort, "[i]t is simply a compensable item of damage when liability is established under traditional tort theories of recovery," as with the negligence and trespass claims here. *Id.* Since this Supreme Court ruling, however, it appears that no published Missouri appellate decision has yet set forth what specifically a plaintiff must prove in order to obtain medical monitoring as a remedy. Here, Plaintiffs have submitted significant evidence showing with a reasonable degree of medical certainty that, due to the specific alpha particle radiation exposure, each member of the class suffered an immediate bodily injury but, due to the latency periods of some possible exposure-related diseases, they each will require a medical exam and medical monitoring protocol no less than once every 2 to 3 years at an estimated cost between $1,350 and $23,800 person per exam (depending on the amount of follow up ordered by the examining physician) for the next 30 to 40 years. Nurse Howard testified that, on average, the cost of each medical exam will likely be between $2,000 and $3,000 across the entire class over time. Both Dr. Beattie and Nurse

8

Howard opine with a reasonable degree of medical certainty that certain testing procedures are medically necessary and reasonable. Further, Plaintiffs submitted sufficient evidence to show, and therefore the Court finds, that (a) members of the class have, relative to the general population, been significantly exposed; (b) to a proven hazardous substance; (c) through the tortious conduct of the defendant; (d) the members of the class have suffered a current bodily injury as a proximate result of the exposure, which causes a significantly increased risk of contracting one of several serious latent diseases in the future; (e) this current bodily injury and increased risk of these diseases makes it reasonably necessary for class members to undergo periodic diagnostic medical examination that is different from what would be prescribed in the absence of exposure; and (f) suitable monitoring procedures exist that make early detection of these diseases possible. Relying on persuasive cases from sister courts, the Court finds this evidence to be sufficient and further finds that medical monitoring would have substantial clinical value to the health of the class members. *See generally Perrine v. E.I Du Pont*, 695 S.E. 815 (W. Va. 2010); *Exxon Mobile Corp. v. Albright*, 67 A.3d 111 (Md. 2013); *Potter v. Firestone tire & Rubber Co.*, 6 Cal. 4th 965, 1009 (1993). The Court also finds that class members have a significantly increased risk for contracting the latent diseases identified by Dr. Beattie and Nurse Howard, or similar diseases, and that the proposed methodology for assessing the health of each class members is reasonable and appropriate. While the evidence presented by Plaintiffs could justify with a reasonable degree of medical certainty holding these exams even more frequently, and at a greater cost, the Court finds under the unique circumstances of this case that it is both fair and reasonable for each class member to be medically examined every 2.5 years for the next 30 years, and that $2,500 is reasonable average compensation for the cost for each such exam attributable to the conduct of Collier. Although Plaintiffs submitted evidence

9

that the cost of medical services will increase in the future, the Court has selected the $2,500 average per exam damage amount to take this into account. Further, the Court also finds it reasonable not to reduce this amount for present value, because any time value of money will likely be off-set by any increase in the cost of medical services in the future. Accordingly, the Court finds $2,500 to be a fair damage compensation for each medical exam.

10.      *The life expectancy and gender of members of the class.*  The Court must next determine the number of such medical exams and monitoring protocols each member of the class will require during their lifetimes, given that class members differ in age, gender, and circumstances. Plaintiffs have submitted evidence from the Institute for Health Metrics and Evaluation showing that, in Missouri, the current life expectancy is 75 years for men and 78.5 years for women. Plaintiffs have also submitted U.S. Census data showing that, in Monroe Township, 51% of the people are men and 49% of the people are women. This Court finds this evidence to be credible and adopts it as the Court's finding.

11.      *The age breakdown of members of the class.*  Long-time residents Barbara Williams and Michelle Pratt testified that Autumn Hills was "an average neighborhood" or "typical neighborhood" with age and gender breakdowns not unlike any other community in the area. The Court finds this testimony credible. Because of the size of the class, the long time-periods at issue, and the fact that some residents of Autumn Hills have moved away and are difficult to locate, the Court also finds it reasonable to rely upon average demographic information, statistics, and U.S. Census data for Monroe Township to make findings about the specific make-up and descriptions of the age and genders of the 2,694 class members here for damage calculation purposes. *Jackson v. Grupo Industrial Hotelero, S.A.*, No. 07-22046-CIV, 2009 WL 8634834, at *13 n.12 (S.D. Fla. Apr. 29, 2009). The 2010 US Census provided the

following data for the Monroe Township population:  8.12% of the population is 5 years of age

or under; 20.36% of the population is between 5 and 17 years old; 3.6% of the population is

between 18 and 20; 4.36% of the population is between 21 and 24; 14.17% of the population is

between 25 and 34; 13.7% of the population is between 35 and 44; 16.07% of the population is

between 45 and 54; 6% of the population is between 55 and 59; 4.43% of the population is

between 60 and 64; 5.53% of the population is between 65 and 74; 2.94% of the population is

between 75 and 84; and .717% is over 85.  This Court finds this evidence to be reasonable and

credible and, therefore, adopts it as the Court's finding for the age breakdown of the 2,694

members of the class.

   12.   *Calculation of damages broken down by age category.*  Applying the above

findings and conclusions to the facts of this case, the Court finds the following damages suffered

by each class members' category, with the formula for each set out in detail:

   a.  <u>**MALES 0 to 5 YEARS OF AGE**</u>: 2,694 (total residents for 10 year period) x .51 (%
      of males in Township) = 1374 (# of males for 10 year period) x 8.12% (percent in age
      category) = 112 males that average 2.5 years of age. 75 (average life expectancy for
      male) minus 2.5 (average age in category) = 72.5. Since 72.5 is greater than Nurse
      Howard's recommendation for total monitoring period of 30 years, people in this
      category will be capped at 12 monitoring sessions.  12 x 112 = 1,344 medical
      monitoring sessions x $2,500 = **$3,360,000 for males 0-5 years of age.**

   b.  <u>**FEMALES 0 to 5 YEARS OF AGE**</u>: 2,694 (total residents for 10 year period) x .49
      (% of females in Township) = 1,320 (# of females for 10 year period) x 8.12%
      (percent in age category) = 107 females that average 2.5 years of age. 78.5 (average
      life expectancy for female) minus 2.5 (average age in category) = 76. Since 76 is
      greater than Nurse Howard's recommendation for total monitoring period of 30 years,
      people in this category will be capped at 12 monitoring sessions.  12 x 107 = 1,284
      medical monitoring sessions x $2,500 = **$3,210,000 for females 0-5 years of age.**

   c.  <u>**MALES 5-17 YEARS OF AGE**</u>: 2,694 (total residents for 10 year period) x .51 (%
      of males in Township) = 1374 (# of males for 10 year period) x 20.36% (percent in
      age category) = 280 males that average 11 years of age. 75 (ave. life expectancy for
      male) minus 11 (ave. age) = 64.  Since 64 is greater than Nurse Howard's

11

recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions.   12 x 280 = 3,360 medical monitoring sessions x $2,500 = **$8,400,000 for males 5–17 years of age**.

d. **FEMALES 5 - 17 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 20.36% (percent in age category) = 269 females that average 11 years of age. 78.5 (average life expectancy for female) minus 11 (ave. age) = 67.5.  Since 67.5 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 269 = 3,228 medical monitoring sessions x $2,500 = **$8,070,000 for females 5–17 years of age**.

e. **MALES 18-20 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1374 (# of males for 10 year period) x 3.6% (percent in age category) = 49 males that average 19 years of age.  75 (ave. life expectancy of a male) minus 19 (ave. age) = 56.  Since 56 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 49 = 588 medical monitoring sessions x $2,500 = **$1,470,000 for males 18–20 years of age**.

f. **FEMALES 18-20 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 3.6% (percent in age category) = 48 females that average 19 years of age. 78.5 (ave. life expectancy of a female) minus 19 (ave. age) = 59.5. Since 59.5 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 48 = 576 medical monitoring sessions x $2,500 = **$1,440,000 for females 18–20 years of age**.

g. **MALES 21-24 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 4.36% (percent in age category) = 60 males that average 22.5 years of age.  75 (ave. life expectancy of a male) minus 22.5 (ave. age) = 52.5.  Since 52.5 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 60 = 720 medical monitoring sessions x $2,500 = **$1,800,000 for males 21-24 years of age**.

h. **FEMALES 21-24 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 4.36% (percent in age category) = 58 females that average 22.5 years of age. 78.5 (ave. life expectancy of a female) minus 22.5 (ave. age) = 56.  Since 56 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this

12

category will be capped at 12 monitoring sessions. 12 x 58 = 696 medical monitoring sessions x $2,500 = **$1,740,000 for females 21-24 years of age.**

i.   **MALES 25-34 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 14.17% (percent in age category) = 195 males that average 29.5 years of age. 75 (ave. life expectancy of a male) minus 29.5 (ave. age) = 45.5. Since 45.5 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 195 = 2,340 medical monitoring sessions x $2,500 = **$5,850,000 for males 25-34 years of age.**

j.   **FEMALES 25-34 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 14.17% (percent in age category) = 187 females that average 29.5 years of age. 78.5 (ave. life expectancy of a female) minus 29.5 (ave. age) = 49. Since 49 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 187 = 2,244 medical monitoring sessions x 2,500 = **$5,610,000 for females 25-34 years of age.**

k.   **MALES 35-44 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 13.7% (percent in age category) = 188 males that average 39.5 years of age. 75 (ave. life expectancy of a male) minus 39.5 (ave. age) = 35.5. Since 35.5 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 188 = 2,256 medical monitoring sessions x $2,500 = **$5,640,000 for males 35-44 years of age.**

l.   **FEMALES 35-44 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 13.7% (percent in age category) = 181 females that average 39.5 years of age. 78.5 (ave. life expectancy of a female) minus 39.5 (ave. age) = 39. Since 39 is greater than Nurse Howard's recommendation for total monitoring period of 30 years, people in this category will be capped at 12 monitoring sessions. 12 x 181 = 2,172 medical monitoring sessions x $2,500 = **$5,430,000 for females 35-44 years of age.**

m.  **MALES 45-54 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 16.07% (percent in age category) = 221 males that average 49.5 years of age. 75 (ave. life expectancy of a male) minus 49.5 (ave. age) = 25.5. 25.5 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 10.2 medical monitoring session for e ach male in this category. 10.2 x 221 = 2,254 medical monitoring sessions x $2,500 = **$5,635,000 for males 45-54 years of age.**

13

n. **FEMALES 45-54 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 16.07% (percent in age category) = 212 females that average 49.5 years of age. 78.5 (ave. life expectancy of a female) minus 49.5 (ave. age) = 29. 29 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 11.6 medical monitoring session for each female in this category. 11.6 x 212 = 2,459 medical monitoring sessions x $2,500 = **$6,147,500 for females 45-54 years of age.**

o. **MALES 55-59 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 6% (percent in age category) = 82 males that average 57 years of age. 75 (ave. life expectancy of a male) minus 57 (ave. age) = 18. 18 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 7.2 medical monitoring session for each male in this category. 7.2 x 82 = 590.4 medical monitoring sessions x $2,500 = **$1,476,000 for males 55-59 years of age.**

p. **FEMALES 55-59 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 6% (percent in age category)= 80 females that average 57 years of age. 78.5 (ave. life expectancy of a female) minus 57 (ave. age) = 21.5. 21.5 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 8.6 medical monitoring session for each female in this category. 8.6 x 80 = 688 medical monitoring sessions x $2,500 = **$1,720,000 for females 55-59 years of age.**

q. **MALES 60-64 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 4.43% (percent in age category) = 61 males that average 62 years of age. 75 (ave. life expectancy of a male) minus 62 (ave. age) = 13. 13 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 5.2 medical monitoring session for each male in this category. 5.2 x 61 = 317.2 medical monitoring sessions x $2,500 = **$793,000 for males 60-64 years of age.**

r. **FEMALES 60-64 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 4.43% (percent in age category) = 59 females that average 62 years of age. 78.5 (ave. life expectancy of a female) minus 62 (ave. age) = 16.5. 16.5 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 6.6 medical monitoring session for each female in this category. 6.6 x 59 = 389.4 medical monitoring sessions x $2,500 = **$973,500 for females 60-64 years of age.**

s. **MALES 65-74 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 5.53% (percent in age

14

category) = 76 males that average 69.5 years of age. 75 (ave. life expectancy of a male) minus 69.5 (ave. age) = 5.5. 5.5 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 2.2 medical monitoring session for each male in this category. 2.2 x 76 = 167.2 medical monitoring sessions x $2,500 = **$418,000 for males 65-74 years of age.**

t.   **FEMALES 65-74 YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 5.53% (percent in age category) = 73 females that average 69.5 years of age. 78.5 (ave. life expect. of a female) minus 69.5 (ave. age) = 9. 9 divided by 2.5 (Nurse Howard's recommendation for years between medical monitoring) = 3.6 medical monitoring session for each female in this category. 3.6 x 73 = 262.8 medical monitoring sessions x $2,500 = **$657,000 for females 65-74 years of age.**

u.   **MALES 75+ YEARS OF AGE**: 2,694 (total residents for 10 year period) x .51 (% of males in Township) = 1,374 (# of males for 10 year period) x 3.66% (percent in age category) = 50 males that are 75 years or older. Since this is above life expectancy, the Court finds it reasonable to assign this group 1 medical monitoring session for each male in this category. 1 x 50 = 50 medical monitoring sessions x $2,500 = **$125,000 for males 75 years of age or older.**

v.   **FEMALES 75+ YEARS OF AGE**: 2,694 (total residents for 10 year period) x .49 (% of females in Township) = 1,320 (# of females for 10 year period) x 3.66% (percent in age category) = 48 females that are 75 years or older. Since this is slightly below life expectancy, the Court finds it reasonable to assign this group 1 medical monitoring session for each female in this category. 1 x 48 = 48 medical monitoring sessions x $2,500 = **$120,000 for females 75 years of age or older.**

13.   *Total medical monitoring damages to the class for bodily injury.* In summary, based on the above findings, the Court finds that the class has been damaged in the amount of $70,085,000 for medical monitoring of their bodily injuries. This comes to an average per class member of $26,015. The Court finds these amounts to be accurate, reasonable, non-speculative, and based on the evidence before it.

14.   Accordingly, the Court orders and enters judgment for the class, and against Collier, in the amount of $70,085,000 for bodily injury, plus post-judgment interest at the maximum statutory rate.

15

## Calculation Of Property Damages Suffered By Each Class Member

15.     Plaintiff Barbara Williams testified that she purchased her mobile home for $45,000. It is Williams' opinion that because her mobile home has had radiation pumped through it for a number of years and she would have to disclose that fact to a potential buyer, the fair market value of her mobile home is zero. An owner's opinion of the value of their property is admissible on the element of property damages. Plaintiffs' expert Albert Westover, a certified appraiser with 50 years of experience, testified that the average value of mobile homes in Autumn Hills after the radiation exposure would likely be around $3,000. Given the level and time period of the radiation here, the Court agrees and finds this evidence reasonable and finds that the radiated mobile homes in Autumn Hills now have a value of $3,000 dollars. Accordingly, the Court finds that Barbara Williams suffered $42,000 in property damage.

16.     The Court further finds that the remaining 397 mobile homes in Autumn Hills are also now worth $3,000 due to the alpha particle contamination. Plaintiffs have submitted U.S. Census Bureau data showing that the average value of a mobile home in Missouri is $37,500. This value appears consistent with Barbara William's testimony that her mobile home was slightly nicer than the average homes in the park. Some homes, like Ms. Pratt's, may have been worth more than this amount. Plaintiffs' expert Albert Westover testified that absent the radiation exposure, the value of mobile homes in Autumn Hills during the class period ranged between $15,000 and $45,000, with the average mobile home in the park worth approximately $33,000. For purposes of this damage calculation, the Court finds that $33,000 is a reasonable average value for the other 397 mobile homes in Autumn Hills absent the radiation exposure, and that $3,000 is the reasonable average residual value of each mobile home after exposure to occurrences of radiation. Accordingly, the Court concludes that the class members (other than

Barbara Williams, whose property damage is addressed above) who owned the mobile homes during the class period have suffered property damage in the amount of $11,910,000. ($30,000 x 397 mobile homes).

17.     The total amount of property damaged suffered by the class and Williams together is $11,952,000. The Court finds these amounts to be accurate, reasonable, non-speculative, and based on the evidence before it.

18.     Accordingly, the Court orders and enters judgment for the class, and against Collier, in the amount of $11,952,000 for property damage, plus post-judgment interest at the maximum statutory rate.

## Distribution Order

19.     At such time as any funds are obtained for the benefit of the class, the Court orders that such funds be held in escrow by class counsel for the benefit of class members, and that class counsel shall prepare a distribution and monitoring plan after any money is collected. Nothing in this Distribution Order prevents or is intended to prevent the finality of this Court's judgment on any issue in this case.

//

//

//

//

//

//

## Entry Of Judgment

Accordingly, it is **HEREBY ORDERED, JUDGED, ADJUDICATED AND DECREED** that judgment is entered in favor of the class and against Defendant Collier on the negligence and trespass claims in the total amount of $82,037,000, plus post-judgment interest at the maximum statutory rate.  Specifically, the Court finds that the class has suffered injury and been damaged in the amount of $70,085,000 for bodily injury and an additional $11,952,000 for property damage.  Costs are to be taxed against Defendant Collier.

Date: __8/28/13_____

_David N. Ash_ 25440

David H. Ash, Judge

State of Missouri } SS.
County of Lincoln,

I, the undersigned, Clerk of the Circuit Court do hereby certify that above and foregoing to be a true copy of original _Findings of Fact, Conclusions of Law_

as the same appears of record in my office.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at office in Troy, this the _16th_ day of _September_ 20 _13_.

GRACE SINCLAIR, Circuit Clerk

By _Deanne Doll_ D.C.